(No. 74704

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. REGINALD MAHAFFEY, Appellant.

*Opinion filed March 23, 1995.—Rehearing denied May 30, 1995.*

Charles M. Schiedel, Deputy Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Roland Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Arleen C. Anderson, Assistant Attorney General, of Chicago, and Renee G. Goldfarb and Judy L. DeAngelis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, Reginald Mahaffey, was convicted of the murders of Jo Ellen and Dean Pueschel and of the attempted murder of their son, Richard. The defendant was also convicted of a number of other offenses relating to the break-in at the Pueschels' residence. At a separate sentencing hearing, the jury found the defendant eligible for the death penalty and further determined that there were no mitigating circumstances sufficient to preclude imposition of that sentence. The defendant received terms of imprisonment for his noncapital convictions. The defendant's execution has been stayed pending direct review by this court. (Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rules 603, 609(a).) For the reasons that follow, we affirm the judgment of the circuit court.

In 1989, following an initial trial on the offenses charged here, this court reversed the defendant's convictions and sentences and remanded the cause to the circuit court for a new trial and sentencing hearing, finding reversible error in the trial court's failure to sever the defendant's trial from that of a codefendant, his brother Jerry Mahaffey. (*People v. Mahaffey* (1989), 128 Ill. 2d 388, 409-12.) On remand, the defendant waived his right to the assistance of counsel for purposes of both the trial and the capital sentencing hearing. Although the defendant was representing himself, at least one public defender, and sometimes two, stayed in the courtroom as standby counsel throughout the proceedings.

The offenses in this case were discovered by Jo Ellen's father, Joseph Heinrich, Sr., who drove to his daughter's home on the morning of August 29, 1983, after his daughter failed to drop off her son, Richard, at the Heinrichs' house and after Heinrich's call to the Pueschel residence went unanswered. Richard's school was still on summer vacation, and Richard was staying with his grandparents during the day while his parents worked. When Heinrich arrived at his daughter's apartment building, which was less than two miles from his own home, he found Richard walking outside, covered with blood. Richard told his grandfather that his parents were dead. Heinrich went inside the apartment and called the police.

The Pueschels lived in a three-story building. Their apartment was located on the first floor, and investigators discovered the bathroom window open and the window screen lying on the ground below. The body of Jo Ellen Pueschel was found on the dining room floor, and the body of Dean Pueschel was found on the floor in the master bedroom, between the bed and a dresser.

Richard Pueschel was 11 years old at the time of the offenses and was 18 at the time of the present trial. At trial, Richard testified that he went to bed around 8:30 the evening preceding the offenses. Richard woke up some time later and felt something covering his mouth and nose. He heard two persons telling him to be quiet. Richard tried to scream but was unable to do so, and he then lost consciousness. Richard woke up later, got out of bed, and went to the kitchen. There, he saw one man holding his mother, and he saw another man entering the apartment through the back door. One of the men ordered Richard and his mother to lie down on the dining room floor. In court, Richard identified the defendant as one of the two men he saw in the apartment that night, saying that he was "99% sure" that the defendant was there.

Richard next remembered waking up in his own bed. He was covered with blood. Richard found the body of Dean Pueschel in the master bedroom, and he found his mother's body in the dining room. Richard heard the telephone ringing but was unable to answer it because the receiver had been torn from the phone. Richard stated that he then went outside, where his grandfather found him. On cross-examination, Richard acknowledged that he had been unable to identify the defendant in a lineup conducted on September 2, 1983, several days after the offenses charged here. Richard was still being hospitalized for his injuries at the time the lineup was conducted.

Dr. Philip Sheridan, the surgeon who treated Richard, testified that the youth sustained a major laceration on his scalp, a fractured skull, a brain hemorrhage, two black eyes, and four stab wounds to the back. The head injuries were consistent with the victim's having been struck by a baseball bat or similar object. The doctor accompanied Richard on the trip to the police station to view the lineup. According to Dr. Sheridan,

Richard had not yet completely recovered from his injuries at that time.

The defendant was taken into custody for these offenses on September 2, 1983. After receiving information earlier that morning from one of the defendant's brothers, Cedric Mahaffey, police officers arrested the defendant and another brother, Jerry Mahaffey, and seized evidence discovered at the places where they were arrested. The officers went first to the residence where the defendant was staying. The officers were admitted to the apartment by another person, who signed a form consenting to a search of the premises. The defendant was found lying on the floor in one of the bedrooms and was placed under arrest. After receiving *Miranda* warnings, the defendant told the officers that he knew he was going to get caught. The defendant went on to provide the officers with a brief description of the offenses and of the property taken from the Pueschels' home.

The officers found a loaded .357 Magnum revolver on a nightstand next to where the defendant was lying. In the closet, officers found about two dozen pieces of jewelry, a shotgun, and shotgun shells. Other ammunition was found elsewhere in the room. After the discovery of these items, the defendant told the officers that they had " 'most of what we've got.' " At the police station where the defendant was taken following his arrest, the defendant removed a ring from his finger and a watch and chain from his pocket and said that they too belonged with the other pieces of property that had been seized.

Additional items belonging to the Pueschels were found at the two other locations pointed out by Cedric Mahaffey. In a bedroom closet at Jerry Mahaffey's home, police found a video cassette recorder, video games, and video cassettes. Police found a portable television set and a carbine rifle at the third place.

The defendant provided law enforcement authorities with a confession shortly after his arrest. The defendant made the statement in the presence of a court reporter. After the statement was transcribed, the defendant corrected it and signed it. The confession was introduced into evidence at trial and was read to the jury. In the statement, the defendant said that on August 29, 1983, he and one of his brothers, Jerry Mahaffey, decided to go to the north side of Chicago to commit a burglary. After the vehicle they were driving broke down, the defendant and his brother began walking. They went by an apartment building and noticed that a window was open. The defendant said that he removed the screen from the window, and the two then crawled in through the open window. They took money from a wallet they found in the kitchen. The defendant said that he picked up a butcher knife in the kitchen, and the defendant and his brother then went into a child's bedroom. The defendant put a pillow over the youth's head and choked him and Jerry stabbed the boy. There were baseball bats in the bedroom, and Jerry hit the boy on the head with one of the bats. The two brothers then left the room, each of them taking a baseball bat.

The defendant and Jerry then entered the master bedroom. They both struck the man on the head with the bats; the woman then woke up, and the defendant took her to the kitchen, where, he said, he had sex with her. The defendant later moved her to the living room, where, he said, he finished having sex with her. The defendant said that Jerry then came out of the bedroom, carrying a .357 Magnum revolver. The defendant later went to the master bedroom and took a number of items from a jewelry box. When the defendant returned to the living room, he saw Jerry sexually assaulting the woman.

The defendant and Jerry asked the woman where the car keys were, and she said they were on the table. She also said that the car had an alarm, and she went outside with the defendant to deactivate it. The defendant and the woman then returned to the apartment, where the defendant packed some things in a box, including a video cassette recorder and a portable television set. The defendant also took a shotgun, rifle, and revolver. The defendant hit the woman on the head with the revolver and told her to lie down. According to the defendant, Jerry said that they should kill the woman. As the defendant went out to the car, he heard what he described as "solid hits," and thought that Jerry was beating the woman and the boy with a baseball bat. The defendant started the car and waited for his brother, who came out of the apartment several minutes later.

The defendant said that he and Jerry drove first to the apartment where the defendant was living. After unloading the car, they drove to a different location and abandoned the vehicle. The defendant and Jerry later divided the property. The defendant said that he kept the .357 Magnum revolver, the shotgun, and the jewelry, while Jerry took a rifle, a video cassette recorder, and some video tapes. The defendant said that he later took video games and a portable television set to another brother's house.

At trial, surviving family members identified the jewelry, guns, and television set, video cassette recorder, video cassettes, and video games seized by the police as belonging to the Pueschels. An abandoned car found parked near a housing project on the afternoon of August 30, 1983, was also identified as Jo Ellen's.

The autopsy performed on Jo Ellen revealed a number of lacerations on her scalp and head. Her skull had been fractured, and there was evidence of brain hemorrhages. The doctor who performed the autopsy concluded that the cause of her death was injuries to

the skull and brain from blunt trauma. These injuries were consistent with being struck by an object such as a baseball bat. The autopsy of Dean Pueschel disclosed a number of bruises and lacerations to the victim's head, as well as 13 stab wounds to his chest and back. The doctor who performed the autopsy concluded that the cause of Dean's death was multiple stab wounds, and that injuries to the skull and brain were a significant contributing condition. The doctor stated that Dean's skull had been fractured like an egg shell, and that the skull injuries were consistent with the victim's having been struck by a blunt object such as a baseball bat or a gun.

Forensic testing revealed the presence of sperm in Jo Ellen Pueschel's vagina. In addition, blood on one of the baseball bats found at the crime scene was consistent with Jo Ellen's blood type, and blood on another bat was consistent with Dean's. Blood consistent with Jo Ellen's was also found on the .357 Magnum revolver seized from the defendant.

The defendant did not present any evidence in his own behalf. At the conclusion of the proceedings, the jury returned verdicts finding the defendant guilty of the murders of Jo Ellen and Dean Pueschel and of the attempted murder of Richard Pueschel. The jury also found the defendant guilty of home invasion, rape, armed robbery, aggravated battery to a child, residential burglary, and theft (over $300).

The matter then proceeded to a separate sentencing hearing. At the first stage of the hearing, the State sought to establish the defendant's eligibility for the death penalty on two grounds: the defendant's conviction for multiple murders, and the commission of murder in the course of a felony (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(b)(3), (b)(6)). During the first stage of the hearing, the State introduced into evidence the verdicts that

the jury had returned the previous week. After the close of evidence, the jury determined that the defendant was 18 years of age or older at the time of the offenses and found that he was eligible for the death penalty on the latter ground asserted by the State, murder in the course of a felony.

At the second stage of the sentencing hearing, the State first presented testimony from Dr. Robert Reifman, who had conducted a brief fitness examination of the defendant prior to the start of the sentencing hearing. Dr. Reifman, who was head of the Cook County Psychiatric Institute, testified that he found no evidence that the defendant was suffering from a mental disease and no evidence that the defendant was psychotic. Dr. Reifman did find evidence that the defendant was suffering from a mixed personality disorder and said that the defendant was antisocial, narcissistic, passive-aggressive, immature, and impulsive.

In aggravation, the State also presented testimony detailing the defendant's prior convictions. In 1978 the defendant was charged with the burglary of a used-car dealership. The defendant pleaded guilty to that offense and was sentenced to three years' probation, with 10 days in jail and restitution of $450. In 1979, the defendant was charged with the burglary of a general merchandise store. He entered a guilty plea to the charge and was sentenced to two years' imprisonment. In 1980, the defendant was charged with the robbery of a White Castle restaurant. He later pleaded guilty to the charge and was sentenced to four years' imprisonment.

The prosecution also introduced evidence of the defendant's attempt to escape from the Cook County jail in March 1984, prior to his first trial on these charges. In the escape attempt, the defendant and five other inmates, including the defendant's brother Jerry, forced

officers at the jail to surrender their uniforms. The prisoners then dressed in the jailers' uniforms and attempted to leave the facility, taking at least two of the staff with them as hostages. Police officers eventually overpowered the inmates. The defendant was armed with a gun during the escape attempt.

The defendant rested without presenting any evidence in mitigation. At the conclusion of the proceeding, the jury found that there were no mitigating circumstances sufficient to preclude a sentence of death. The trial judge accordingly sentenced the defendant to death. At a later hearing, the trial judge sentenced the defendant on the remaining convictions, all felonies. The judge imposed an extended term of 60 years' imprisonment for the attempted murder of Richard Pueschel. The judge also sentenced the defendant to prison terms of 30 years for home invasion, 30 years for armed robbery, and 30 years for rape, with all the sentences of imprisonment to run consecutively. The judge did not sentence the defendant on his convictions for aggravated battery to a child, residential burglary, and theft (over $300), concluding that those offenses were merged in the other crimes.

I

Prior to trial, counsel who was representing the defendant at that time moved for a hearing to determine whether the defendant was fit to stand trial. Following a hearing on the question, the trial judge concluded that the defendant was competent. The defendant first argues that the trial court's finding that he was fit for trial was against the manifest weight of the evidence. According to the defendant, the record clearly establishes that he was under a religious delusion that he could not be found guilty and sentenced to death. In a nutshell, the defense theory is that the defendant believed that he had been found free of sin by God

because he had survived a life-threatening fall from a second-story window in 1984, while he was in custody on the present charges. The defendant also maintains that his unfitness for trial rendered him incapable of knowingly and intelligently waiving his right to counsel.

The defendant's fitness hearing was held over the course of several days in December 1990 and January 1991. Prior to the hearing, the prosecution and the defense agreed that there was no dispute in this case concerning the defendant's ability to understand the nature and purpose of the proceedings. Rather, the dispute here centered on the second part of the fitness inquiry, whether the defendant was able to assist in his own defense. (See Ill. Rev. Stat. 1991, ch. 38, par. 104—10 ("A defendant is unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense").) At the hearing, each side presented extensive testimony in support of its respective position. We set out below the pertinent portions of the testimony.

Dr. James Cavanaugh, a psychiatrist and president of the Isaac Ray Center in Chicago, testified on behalf of the prosecution. Dr. Cavanaugh interviewed the defendant on May 14, 1990. Prior to the examination, Dr. Cavanaugh reviewed a number of documents and records, including the defendant's prior medical treatment at the Cook County jail and at the Menard penitentiary, his confession, and transcripts from earlier proceedings. In response to the psychiatrist's questions, the defendant explained what he was charged with and the purpose of the jury, judge, and attorneys. The defendant also knew the outcome of the first trial and the reason for the reversal of his original conviction and sentence. The defendant was oriented, alert, and cooperative during the interview and did not demonstrate any psychotic

thought processes. Dr. Cavanaugh noticed, however, that the defendant seemed preoccupied with religious themes. In Dr. Cavanaugh's view, however, none of this was evidence of mental illness. The defendant told Dr. Cavanaugh that he felt fit for trial and that he disagreed with counsel's decision to raise fitness as an issue.

Based on an examination of the defendant and a review of the relevant records and reports, Dr. Cavanaugh concluded that the defendant was fit to stand trial. Dr. Cavanaugh believed that the defendant had an antisocial personality disorder, with borderline intellectual functioning, and was status post, meaning that he had previously sustained a closed-head injury. Dr. Cavanaugh noted that the defendant was not currently receiving treatment in jail and had no present need for treatment.

Dr. Cavanaugh also relied in part on testing done by Dr. Wasyliw, a psychologist. The testing showed mild cognitive impairments, including some problems with memory, on the part of the defendant, but none of these problems interfered with the defendant's capacity to understand the trial process or to cooperate with defense counsel.

Also testifying in behalf of the State at the fitness hearing was Dr. Mark McClung, a psychiatrist with the Isaac Ray Center. Dr. McClung examined the defendant on April 19, 1990. Prior to the examination, Dr. McClung reviewed the defendant's medical records, as well as transcripts from earlier proceedings. The defendant knew the purpose of the meeting and was oriented in time and place. The defendant told the psychiatrist what offenses he was charged with and was able to describe the functions of an attorney, a judge, and a jury. The defendant mentioned certain religious beliefs and at one point declared that he was certain that he would be found not guilty because of his beliefs. The defendant

went on to say, however, that if he was found guilty, then he was not as innocent as he believed he was.

From an examination of the defendant and a review of the pertinent records, Dr. McClung concluded that the defendant was fit for trial and was capable of cooperating with counsel if he chose to. Dr. McClung believed that the defendant had an antisocial personality disorder, with a past history of organic brain syndrome. Dr. McClung stated that, although some of the defendant's beliefs did not sound close to reality, the defendant's behavior and other statements demonstrated that he was aware of the realities of the situation facing him. And while certain statements showed passiveness on the part of the defendant and a belief that everything was in God's hands, the defendant also seemed to be talking about and thinking about playing an active role at trial. He had specific ideas about trial strategy and preferred to have a jury trial.

At the fitness hearing, the State also presented testimony from four guards at the Cook County jail who had been in contact with the defendant from the time he was returned to the jail late in October 1989 for his second trial through the time of the fitness hearing, more than a year later. The guards testified that the defendant did not engage in unusual or abnormal behavior. In addition, a search of disciplinary records at the jail failed to reveal that the defendant had incurred any disciplinary tickets during that period.

Dr. Larry Goldman, a psychiatrist and a faculty member at the University of Illinois and the University of Chicago, testified on behalf of the defendant at the fitness hearing. Dr. Goldman examined the defendant in December 1989. Defense counsel was present during the interview so that Dr. Goldman could determine how well the defendant would cooperate with counsel. At the interview, the defendant stated that he did not want

counsel to do anything to prepare for trial. The defendant insisted that he would be found not guilty and said that he had received a communication from God.

Dr. Goldman found that the defendant had an elaborate system of religious delusions and believed that the defendant was suffering from an organic delusional disorder. Dr. Goldman thought that the defendant understood the nature of the proceedings in court quite well but believed that the defendant's psychiatric disorder would prevent him from being able to cooperate with counsel. Dr. Goldman also stated that he had spoken briefly with the defendant prior to testifying at the hearing. The defendant remained convinced that he would be found not guilty.

In support of his evaluation of the defendant, Dr. Goldman noted that the defendant's medical records showed that he fell from a window in 1984, injuring his head, breaking a number of ribs, and rupturing his spleen. The defendant remained in a coma for about six weeks afterwards. There was no record that the defendant suffered any psychological problem prior to the fall. Records from the Cook County jail showed that the defendant, following his release from the hospital, set fire to his cell and stored feces and vomit in his cell. Dr. Goldman also noted that the defendant had been diagnosed as suffering from paranoid schizophrenia while he was on death row at Menard during the period from March 1985 to October 1989. Dr. Goldman explained that the prison diagnosis was similar to his own, and he stated that the symptoms of the two conditions are essentially the same.

Dr. Goldman also reviewed the transcript of the defendant's testimony from a hearing conducted in November 1987. According to Dr. Goldman, the testimony was illogical and unresponsive and evidenced the defendant was preoccupied with religion and that his

thought processes were disturbed. In Dr. Goldman's view, this was suggestive of a psychotic disorder.

On cross-examination, Dr. Goldman stated that he had reviewed only the transcript of the defendant's testimony from the November 1987 hearing. After reading the defendant's testimony from his first trial, which was also conducted after the defendant's fall, Dr. Goldman agreed with the prosecutor that the defendant's responses at that time seemed appropriate and cooperative.

Donald Honchell, an assistant public defender who was assigned to the defendant's first appeal, also testified in the defendant's behalf at the fitness hearing. Honchell said that he would send things by mail to the defendant, who would refuse to accept them; they were then returned to the attorney. Honchell testified that in 1987 he filed a motion with the supreme court to stay the proceedings on appeal pending a determination of the defendant's fitness on appeal. Honchell explained that he filed the motion because of what he had heard about the defendant's conduct in jail; the motion was denied. Honchell also said that the defendant, during an unrelated hearing held in November 1987, interrupted him and tried to fire him.

At the conclusion of the hearing, the judge ruled that the defendant was competent to stand trial. The judge noted that the defendant clearly understood the nature of the proceedings and that the only question in dispute was whether the defendant could cooperate with counsel. The judge believed that the evidence before him, including transcripts of the defendant's prior testimony, showed that the defendant's remarks were appropriate and that he was goal-oriented and focused, even though he rambled at times. In fact, the judge found the evidence of the defendant's competency so strong that he believed that the State had established

the defendant's fitness not only by a preponderance of the evidence, but also by the higher standard of clear and convincing proof.

Once the question is properly raised, the burden falls on the State to establish a defendant's fitness by a preponderance of the evidence. (Ill. Rev. Stat. 1991, ch. 38, par. 104—11(c); see also *People v. Bender* (1960), 20 Ill. 2d 45, 53-54.) We do not believe that the trial judge's finding that the defendant was fit for trial was against the manifest weight of the evidence. "The credibility and weight to be given psychiatric testimony are for the trier of fact" (*People v. Bilyew* (1978), 73 Ill. 2d 294, 302), and there was ample expert evidence in this case on which the judge could base his determination of competency. The State's witnesses concluded that the defendant understood the nature and purpose of the proceedings and was able to assist in his own defense. The prosecution experts were aware of the defendant's statements concerning his religious beliefs, yet they concluded that the defendant was simply preoccupied with religion, and they rejected the defense notion that the defendant was laboring under a mental delusion. The judge was not required to accept the defense expert's contrary view, for "[t]he ultimate issue was for the trial court, not the experts, to decide" (*Bilyew*, 73 Ill. 2d at 302).

Moreover, the conduct of the defendant during the trial and the sentencing hearing failed to demonstrate that he was unfit at the time of either phase of the proceedings. It is true, as defense counsel observes, that the defendant asked insulting questions of the victims' family members in his cross-examination of those witnesses, and that he made rambling, overly long closing arguments, referring repeatedly to religious themes. Still, the defendant asked witnesses appropriate questions, and he made proper objections at various points

in the proceedings. On this record, we must uphold the trial judge's finding that the defendant was fit. Because we decline to disturb the trial judge's fitness finding, we must also reject the defendant's related contention that he was not competent to waive his right to counsel. Competence to waive counsel is measured by the same standard as competence to stand trial (*Godinez v. Moran* (1993), 509 U.S. 389, 397, 125 L. Ed. 2d 321, 330, 113 S. Ct. 2680, 2685), and the defendant's fitness for trial therefore also established his fitness to waive counsel.

The defendant next argues that he was entitled, under the sixth amendment, to have counsel present with him at the court-ordered psychiatric examinations conducted by the prosecution's experts as part of the fitness inquiry prior to trial. The defendant maintains that the examinations constituted critical stages of the proceedings, and that he therefore should have been provided with counsel on those occasions. The defendant acknowledges that this court rejected the same argument in *People v. Larsen* (1979), 74 Ill. 2d 348, and he asks us now to overrule the earlier decision.

In making this argument, the defendant relies on the views expressed by the justice who dissented in *Larsen* (74 Ill. 2d at 357 (Clark, J., dissenting)), and does not raise any new ground for reconsidering the decision in that case. Like the dissent in that case, the defendant emphasizes that the presence of counsel is important if counsel is to later conduct an effective cross-examination of the witness. Because the defendant later waived the right to counsel, one must question whether he could have incurred any harm then as a consequence of the alleged error.

Notably, in *Estelle v. Smith* (1981), 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866, the Supreme Court held that defense counsel must be given advance notice of a fitness examination, but the Court expressly did not

rule that a defendant is entitled to the presence of counsel at an exam. Rather, the Court stated, "Respondent does not assert, and the Court of Appeals did not find, any constitutional right to have counsel actually present during the examination. In fact, the Court of Appeals recognized that 'an attorney present during the psychiatric interview could contribute little and might seriously disrupt the examination.' [Citations.]" (*Estelle*, 451 U.S. at 470 n.14, 68 L. Ed. 2d at 374 n.14, 101 S. Ct. at 1877 n.14.) Our earlier decision in *Larsen* was correct. As the Supreme Court recognized in *Estelle*, there are valid diagnostic reasons for refusing to permit counsel to be present during a psychiatric exam. See also *People v. Hampton* (1992), 149 Ill. 2d 71, 105.

The defendant also contends that the trial court erred in denying his motion to quash his arrest and to suppress physical evidence seized at the time of the arrest. As noted above, several days after the offenses charged here, one of the defendant's brothers led police to the apartment where the defendant was staying. In a warrantless search of the premises, the officers found the defendant and a number of possessions that had been taken from the victims' residence. The defendant was arrested, and he later made a statement admitting his involvement in the crimes. The trial judge refused to suppress any of this evidence, concluding that the search was conducted with the consent of the tenant who leased the premises and, alternatively, that the search and seizure were justified by exigent circumstances.

The hearing on the defendant's motion to quash his arrest commenced on February 9, 1984, prior to the defendant's first trial on these charges. Although the defendant challenged the trial judge's ruling in his initial appeal, this court did not resolve the question at that time but instead reversed the defendant's convictions and sentences on other grounds.

Testifying at the suppression hearing, the defendant stated that he was in a bedroom in the back of the apartment when an officer came into the room with a weapon drawn. The defendant said that he did not provide consent to the entry. The defendant testified further that he was renting a room in the apartment from the tenant, Morriell Redmond. According to the defendant, Redmond was not living there at the time, though he occasionally stayed in the front bedroom.

Morriell Redmond also testified in the defendant's behalf at the suppression hearing. Redmond stated that on the morning of the defendant's arrest, the officers pointed their weapons at him and forced their way into the apartment, and that they later forced him to sign the form consenting to the search. Redmond also testified that sometime before August 1983 he had rented part or all of the basement apartment to the defendant, explaining that he lived elsewhere with his girlfriend. According to Redmond, the defendant had keys to the apartment and paid him rent in August, though he did not give the defendant a receipt. On cross-examination, Redmond stated that he paid rent of $200 a month for the apartment to his grandmother, that the furniture in the apartment belonged to him, and that he did not move out of the apartment until October 1983.

Sergeant John Byrne of the Chicago police department testified on behalf of the prosecution regarding the circumstances of the defendant's arrest. Byrne stated that early in the morning on September 2, 1983, he responded to a call to meet another police officer who had with him a person claiming to have knowledge of a double homicide that had been committed on the north side of Chicago. Byrne then met with Cedric Mahaffey, who said that he knew who had committed the crimes in which, Cedric said, a man and a woman had been killed and a boy had been beaten. Cedric told Sergeant

Byrne that the two persons involved in the offenses were his brothers, Reginald and Jerry Mahaffey. Cedric said that earlier that night he had helped Jerry move some of the property taken during the break-in, and he showed Byrne a video cassette taken from the victims' residence.

Cedric then directed Byrne to the different apartments where the defendant, Jerry, and a third brother, Terry Mahaffey, lived, and said that items belonging to the victims could be found at those locations. As they were approaching the defendant's apartment, the police car passed within 10 or 15 feet of Terry, who was standing on a street corner; Cedric screamed and pulled a towel over his face. Cedric said that he feared that Terry might tell the defendant, who lived nearby, that Cedric was with the police. Cedric pointed out the defendant's apartment to the officers and said that two of the guns taken in the robbery were there: the .357 Magnum and the shotgun. Cedric later identified Jerry's apartment, on the south side of the city, and said that stereo equipment and video cassettes could be found there.

After receiving this information from Cedric, Sergeant Byrne and several other officers then drove to the apartment where the defendant lived, arriving around 4:15 in the morning. They knocked on the door, and a person other than the defendant allowed them in. After the person identified himself as Morriell Redmond, the officers explained that they wanted to talk to the defendant about a double homicide. Redmond pointed to the rear of the apartment and said that the defendant could be found there. As Sergeant Byrne and another officer walked toward the rear of the apartment, Redmond signed a form consenting to a search of the premises. Through an open doorway, the officers saw the defendant lying on the floor in a bedroom. The defendant was placed under arrest and various items of property

belonging to the Pueschels were recovered from the scene. On cross-examination, Sergeant Byrne testified that he did not know who rented the apartment where the defendant was found, and he denied that Redmond told him that the defendant rented the apartment.

Sergeant Byrne's partner, Detective Charles Grunhard, also testified at the hearing, stating that Redmond had signed the consent form voluntarily.

The prosecution also introduced testimony from Beatrice Smith, the owner of the apartment building where the defendant was found. Smith stated that she lived in the first-floor apartment, that her grandson, Morriell Redmond, rented the basement apartment, which consisted of four rooms, and that other relatives lived on the second and third floors of the building. Smith said that Redmond paid $200 a month in rent and that he had occupied the apartment for a period of two years, ending in October 1983. On cross-examination, Smith stated that she was aware that the defendant was living in Morriell's apartment and that the defendant had made an arrangement with Morriell to do so. She did not know, however, if Morriell had subleased the apartment to the defendant.

At the conclusion of the hearing, the trial judge denied the defendant's motion to quash his arrest and suppress evidence. The judge ruled that the arrest was proper under both grounds urged by the State: that Redmond consented to the search, and that exigent circumstances justified the warrantless entry and arrest.

The evidence in this case supports both grounds relied on by the trial judge in denying the defendant's motion to quash the arrest. First, we believe that Redmond was authorized to consent to the search of the premises. "[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the de-

fendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." (*United States v. Matlock* (1974), 415 U.S. 164, 171, 39 L. Ed. 2d 242, 249-50, 94 S. Ct. 988, 993; see also *People v. Heflin* (1978), 71 Ill. 2d 525, 541.) The Supreme Court has explained:

> "Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements [citations] but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Matlock*, 415 U.S. at 171 n.7, 39 L. Ed. 2d at 250 n.7, 94 S. Ct. at 993 n.7.

Payment of money by the defendant to Morriell Redmond for use of the bedroom does not preclude a finding that Redmond was authorized to consent to a search of the entire premises. We agree with the trial judge that the evidence in this case demonstrates that Redmond possessed such authority. As the judge found, Redmond was at least a cotenant, there were no restrictions on Redmond's tenancy, and there was no testimony that Redmond was not authorized to enter the bedroom where the defendant was arrested. The door to the bedroom was open at the time, and there was no evidence that the defendant customarily kept it locked or otherwise restricted Redmond's access to the room. In addition, Redmond testified that the furniture in the apartment belonged to him. On this record, we conclude that Redmond possessed authority to consent to the

search of the premises. See *People v. Seidel* (1983), 115 Ill. App. 3d 471, 477-78.

We also agree with the trial judge's conclusion that exigent circumstances separately justified the warrantless search. (See *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371; *People v. Yates* (1983), 98 Ill. 2d 502; *People v. Abney* (1980), 81 Ill. 2d 159.) The following considerations demonstrate that the officers acted properly in proceeding without a warrant. First, the arresting officers had a clear showing of probable cause. Cedric Mahaffey had provided them with detailed information regarding the offenses and the offenders, and, prior to the defendant's arrest, the officers were able to verify a number of facts related to them by the informant. In addition, there was the likelihood that the defendant would flee if he were not apprehended quickly. It will be recalled that the police car in which Cedric was riding with the police drove past Terry Mahaffey as Cedric was directing the officers to the defendant's apartment, and Cedric feared that Terry might warn the defendant. Furthermore, the nature of the entry effected by the officers was peaceful. According to Sergeant Byrne's testimony, which the trial judge credited, the officers knocked on the front door of the apartment, requested entry, and were then allowed in by Redmond.

Nor was there any evidence of unjustified delay by the officers in which they could have obtained search and arrest warrants. Byrne did not speak with Cedric until after 2 o'clock that morning. Cedric then directed Byrne to the places where the defendant and Jerry Mahaffey were staying, as well as to a third location where Cedric said that other items taken in the break-in could be found. Immediately after talking to Cedric, Byrne and the other officers then drove without delay to the apartment where the defendant was staying, arriving there around 4:15 a.m.

The arresting officers were also aware of the gravity of the offenses involved here: a double homicide, and the attempted murder of the victims' son. In addition, the officers knew that the defendant was probably armed. Cedric had informed the officers that the defendant had possession of two of the three guns taken during the offenses. Taken together, the circumstances we have described are sufficient to sustain the trial judge's conclusion that the defendant's warrantless arrest was justified by exigent circumstances. (*Yates,* 98 Ill. 2d at 515-17; *Abney,* 81 Ill. 2d at 169-73.) Moreover, "a reasonable search incident to a lawful arrest is proper" (*People v. Williams* (1967), 36 Ill. 2d 505, 509), and the defendant does not challenge the reasonableness of the ensuing search.

## II

The defendant next argues that the State improperly introduced, at the second stage of the sentencing hearing, evidence from a psychiatric interview in which the defendant had not received *Miranda* warnings. We have already held that the defendant was not entitled, under the sixth amendment, to the assistance of counsel at the pretrial fitness examinations. Citing *Estelle v. Smith* (1981), 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866, the defendant now separately argues that he was entitled to receive *Miranda* warnings at the examination conducted immediately before the start of the sentencing hearing. The interview in question occurred in the interval between trial and sentencing, when the judge conducted an abbreviated inquiry into the defendant's fitness for sentencing. Later, the State presented the expert at the second stage of the sentencing hearing as a witness in aggravation. At that time, the witness stated that the defendant had an antisocial personality, which the witness described, but said that the defendant was not suffering from a mental disease and that the de-

fendant was fit for sentencing. Defense counsel later obtained from the witness an affidavit to the effect that it was not his practice to advise defendants of their *Miranda* rights prior to psychiatric examinations and that he did not believe that he had given those warnings to the present defendant.

The question has been waived, for the defendant raised this issue only in his post-sentencing motion and did not make a contemporaneous objection to the expert's testimony at the sentencing hearing. (*People v. Hampton* (1992), 149 Ill. 2d 71, 99; *People v. Devin* (1982), 93 Ill. 2d 326, 344; see *People v. Enoch* (1988), 122 Ill. 2d 176, 186.) Contrary to the defendant's argument, we do not believe that the question rises to the level of plain error. (134 Ill. 2d R. 615(a) (on review, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court").) The plain error exception is properly applied when the evidence is closely balanced or when the error is so substantial that it denied the defendant a fair proceeding. (*People v. Bean* (1990), 137 Ill. 2d 65, 80; *People v. Fields* (1990), 135 Ill. 2d 18, 56; *People v. Carlson* (1980), 79 Ill. 2d 564, 576-77.) We do not believe that either showing has been made here.

The evidence at the second stage of the defendant's sentencing hearing was not closely balanced. The defendant did not introduce any evidence in mitigation. The State, in contrast, presented extensive evidence in aggravation, including proof of the defendant's repeated criminal conduct. The jury also had before it the evidence of the defendant's role in the brutal crimes committed here, in which a young couple were beaten and stabbed to death and their son was severely injured.

Nor do we believe that the alleged error was substantial. We agree with the State that *Estelle* has only limited application here. In *Estelle*, the United States

Supreme Court held that the protections of the fifth amendment may apply to certain mental health examinations and interviews. In that capital case, a Texas prosecutor used evidence elicited during a pretrial competency examination of the defendant to show the defendant's future dangerousness, a proposition that must be established under the death penalty law of Texas. In the present case, in contrast, the expert merely testified that the defendant was fit and that he was not suffering from a mental disease. Thus, the prosecution was not using evidence obtained in the challenged interview to fulfill a burden of proof or persuasion under the death penalty statute.

In addition, the interview in this case was conducted at the instigation of the defendant's standby counsel, who, at the beginning of the sentencing hearing, asked the judge to reassess the defendant's fitness. The judge granted the request over the State's objection. *Estelle*, however, seemingly excepts defense-initiated examinations from the scope of its rule: "A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." (*Estelle*, 451 U.S. at 468, 68 L. Ed. 2d at 372, 101 S. Ct. at 1876.) Because this interview was prompted by standby counsel's request for further consideration of the defendant's fitness, we question whether *Estelle* is applicable here.

As a final matter, we note that the content of Dr. Reifman's testimony was unlikely to have a negative effect on the jury's evaluation of the defendant. Although Dr. Reifman stated that the defendant was not suffering from a mental disease, he also said that the defendant had a personality disorder and described its main characteristics. We believe that the jurors would have

been as likely to consider this testimony in mitigation as in aggravation.

The defendant next argues that the prosecutor committed reversible error when, in rebuttal argument at the second stage of the sentencing hearing, he quoted a brief passage from the Bible. The defendant did not object to this portion of the prosecutor's argument at the time of the hearing, but he did raise the issue later in his post-sentencing motion. In denying the motion, the trial judge found that the prosecutor's comments had been invited by the defendant's repeated references to scripture and his numerous allusions to Biblical themes. The judge also believed that the State's argument could not have affected the jury's decision to impose the death sentence.

During rebuttal argument at the close of the second stage of the sentencing hearing, the prosecutor made the following comments:

"Divine justice. He [*i.e.*, the defendant] reads from the Bible.

Exodus, chapter 21, verse 1: 'Whoever strikes a man so that he dies shall be put to death but if he did not lie in wait for him but God let him fall into his hand then I will appoint for you a place to which he may flee. But if a man willfully attacks another to kill him treacherously you shall take him from my altar that he may die.'

So ends the reading of Holy Scripture."

The defendant argues that the prosecutor's comments were improper and highly prejudicial.

Like the preceding question, this issue too has been waived, for the defendant raised it only in his post-sentencing motion and did not make a contemporaneous objection at the sentencing hearing. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186.) Nor do we believe that the plain error exception is applicable here. As we stated previously, the evidence at the second stage of the sentencing hearing was not closely balanced. The State introduced extensive evidence in aggravation, while the

defendant failed to introduce any evidence in mitigation. In view of the defendant's numerous references to religious themes, we agree with the trial judge that the passage quoted above could not have had any effect on the jury's decision to sentence the defendant to death. The jurors would have considered the prosecutor's remark insignificant, given the defendant's repeated comments on the Bible in his closing argument at the second stage of the sentencing hearing, and on earlier occasions as well. Moreover, the same jury had already convicted the defendant of the brutal crimes committed here; apart from these offenses, the defendant had a lengthy criminal history; the defendant did not choose to put before the jury any evidence in mitigation.

Similarly, we do not believe that the alleged error deprived the defendant of his right to a fair sentencing hearing. We agree with the State that the prosecutor's brief comments were invited by, and made insignificant by, the numerous religious references made by the defendant in his own closing argument at the second stage of the capital sentencing hearing. Moreover, the jurors were properly advised on the nature and purpose of the parties' arguments and would have understood that the prosecutor's comments did not constitute evidence and did not supplant the instructions they received.

The defendant also contends that the jury returned legally inconsistent verdicts at the conclusion of the first, or eligibility, stage of the bifurcated sentencing hearing. The State sought to base the defendant's eligibility for the death penalty on two aggravating circumstances: the defendant's commission of multiple murders (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(3)), and the defendant's commission of murder in the course of a specified felony (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(6)). The jury returned a verdict on the latter ground, murder in the course of a felony, but not on the

former ground, multiple murders. The multiple-murder verdict required the jury to find that the defendant had been convicted of murdering two or more persons and that the deaths were the result of an intent to kill more than one person, or of separate acts that the defendant knew would cause death or create a strong probability of death or great bodily harm to the victim or another. The murder-in-course-of-felony aggravating circumstance required the jury to find that the defendant acted with intent or knowledge in killing or injuring "the murdered person."

The defendant contends that the jury's failure to return a verdict on the multiple-murder aggravating circumstance is an implied acquittal of the element of intent or knowledge, and is thus inconsistent with the jury's verdict on the murder-in-course-of-felony aggravating circumstance, which also required the jury to find that the defendant acted with intent or knowledge. The defendant notes that the jurors were instructed to consider all the verdict forms and, further, were told to return any verdict form unsigned if they could not unanimously agree on it. The defendant points out that when the prosecution mentioned the jury's failure to return the multiple-murder finding, the trial judge stated, "They have found that he is eligible as a result of the felony murder doctrine, and it is obvious by their lack of signing the other verdict form that they are not—beyond a reasonable doubt, they did not find sufficient evidence on the other theory."

The State contends that the jury's failure to sign the multiple-murder verdict form did not constitute a finding, and therefore was not an acquittal of the intent/knowledge element. Thus, the State believes that there is no inconsistency in the jury's actions regarding the two aggravating circumstances. We would generally agree with this argument, but in this case the jurors

were expressly told to return the forms unsigned if they could not reach agreement on them.

Nonetheless, we find no legal inconsistency between the two verdicts, for we do not believe that the jury's failure to return a finding on the multiple-murder aggravating circumstance necessarily means that the jury was unable to determine that the defendant acted with knowledge or intent with respect to both victims. One explanation that the parties have not raised, but that we believe is warranted, is that the jury could have found that the defendant possessed the requisite intent/ knowledge with regard to one of the victims but not with regard to the other. If that is the case, then the jury would have been unable to return a finding on the multiple-murder aggravating circumstance, which required proof of the requisite intent/knowledge with regard to both victims, yet could have returned a finding on the murder-in-course-of-felony circumstance, which required the jury to make such a finding with respect to only one of the murder victims. Under this view, then, there is no legal inconsistency in the jurors' treatment of the two verdict forms, and their failure to return a finding on the multiple-murder circumstance does not amount to an implied acquittal on the element of intent/knowledge with regard to both victims.

### III

The defendant, in his final two arguments, challenges the constitutionality of the Illinois death penalty statute. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1.) This court has rejected the same contentions in other cases, and the defendant fails to present any new matter that would warrant our reaching a different conclusion here.

The defendant contends first that certain language in the statute effectively bars the sentencing authority from giving meaningful consideration to evidence in mitigation. The defendant refers to the statutory provi-

sion that directs the sentencing judge or jury to impose the death penalty if the sentencer "determines that there are no mitigating factors sufficient to preclude the imposition of the death sentence." (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(g), (h).) Pointing to the phrase "sufficient to preclude," the defendant argues that the statute required him to negate the jury's earlier determination that he was eligible for the death penalty. We have previously rejected this argument, concluding that it is premised on a strained interpretation of the statutory language. (*People v. Strickland* (1992), 154 Ill. 2d 489, 538-39; *People v. Mitchell* (1992), 152 Ill. 2d 274, 345-46; *People v. Hampton* (1992), 149 Ill. 2d 71, 115-17.) We continue to adhere to this view.

As a final matter, the defendant argues that various features of the death penalty statute, working in combination, raise the risk of its arbitrary and capricious imposition. We have previously rejected challenges to these aspects of the statute. Thus, it has been held that the statute is not invalid for affording the prosecutor discretion in determining whether to seek the death penalty in a particular case. (*People v. Lewis* (1981), 88 Ill. 2d 129, 146; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 534-43; see also *Silagy v. Peters* (7th Cir. 1990), 905 F.2d 986, 993-94.) The statute is not invalid for failing to require the prosecution to provide an accused with pretrial notice either of its intent to seek the death penalty (*People v. Silagy* (1984), 101 Ill. 2d 147, 161-62; *People v. Gaines* (1981), 88 Ill. 2d 342, 369) or of the aggravating evidence to be introduced at the sentencing hearing (*People v. King* (1986), 109 Ill. 2d 514, 547; *People v. Albanese* (1984), 104 Ill. 2d 504, 540; *Gaines*, 88 Ill. 2d at 369). Nor is the statute invalid for failing to require the sentencer to provide a written statement of its findings. *King*, 109 Ill. 2d at 550-51; *People v. Stewart* (1984), 104 Ill. 2d 463, 497; *People v. Brownell* (1980), 79 Ill. 2d 508, 541-44.

In addition, comparative proportionality review is not required by the Federal Constitution (*Pulley v. Harris* (1984), 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871), and our State's statute is not invalid for failing to provide for such review (*King*, 109 Ill. 2d at 551; *Stewart*, 104 Ill. 2d at 499; *People v. Kubat* (1983), 94 Ill. 2d 437, 502-04; *Brownell*, 79 Ill. 2d at 541-44). The statute is not invalid for failing to impose on the State a burden of persuasion at the second stage of the sentencing hearing (*People v. Jones* (1988), 123 Ill. 2d 387, 426; *People v. Eddmonds* (1984), 101 Ill. 2d 44, 68; *People v. Free* (1983), 94 Ill. 2d 378, 421), nor does the statute unconstitutionally cast on the defendant the burden of establishing that a sentence other than death should be imposed in his case (*Silagy*, 905 F.2d at 998-99; *People v. Fields* (1990), 135 Ill. 2d 18, 76; *People v. Orange* (1988), 121 Ill. 2d 364, 390; *People v. Caballero* (1984), 102 Ill. 2d 23, 49). Finally, there is no requirement that a capital sentencing jury be informed of the potential length of the prison term that will be imposed if the defendant is not sentenced to death. *People v. Phillips* (1989), 127 Ill. 2d 499, 543; *People v. Albanese* (1984), 102 Ill. 2d 54, 81.

In view of this substantial body of case law, we must reject the defendant's further contention that these same features of the statute, working cumulatively, enhance the risk that the sentence might be imposed in an arbitrary or capricious manner. (*People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 409; *People v. Kokoraleis* (1989), 132 Ill. 2d 235, 292-93.) "If all of the individual aspects are constitutional, we stand by the conclusion that the whole is also constitutional." *People v. Phillips* (1989), 127 Ill. 2d 499, 542-43.

\* \* \*

For the reasons stated, the judgment of the circuit court of Cook County is affirmed. The clerk of this court is directed to enter an order setting Tuesday, September 19, 1995, as the date on which the sentence of death

entered in the circuit court of Cook County is to be carried out. The defendant shall be executed in the manner provided by law (725 ILCS 5/119—5 (West 1992)). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is now confined.

*Judgment affirmed.*