(Nos. 85180, 85181 cons.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JONATHAN HAYNES, Appellant.

*Opinion filed July 6, 2000.*

RATHJE, J., specially concurring.
HARRISON, C.J., dissenting.

Alan M. Freedman, Carol R. Heise and Kathy Kelly, all of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William L. Browers, Assistant Attorney General, of Chicago, and Renee Goldfarb and Jon J. Walters, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Defendant, Jonathan Haynes, was charged with three counts of murder and one count of burglary arising out of the August 6, 1993, shooting death of Dr. Martin Sullivan in Wilmette, Illinois. Following a bench trial in the circuit court of Cook County, defendant was found guilty

of all charges. Defendant waived his right to a jury for the sentencing phase of the proceedings, and the circuit court found defendant eligible for the death penalty on the basis of two eligibility factors: (1) murder in the course of a felony (720 ILCS 5/9—1(b)(6) (West 1992)), and (2) murder committed in a cold, calculated and premeditated manner pursuant to a preconceived plan (720 ILCS 5/9—1(b)(11) (West 1992)). The court then determined that no factors in mitigation were presented to preclude imposition of the death penalty and sentenced defendant to death. On direct appeal, this court affirmed defendant's convictions for intentional murder and burglary, and vacated defendant's convictions for knowing and felony murder. This court also affirmed defendant's death sentence. *People v. Haynes*, 174 Ill. 2d 204 (1996).

During the pendency of defendant's direct appeal, defendant filed a *pro se* petition pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122—1 *et seq.* (West 1994)), alleging that his constitutional rights had been violated during his fitness hearing, trial and sentencing. After obtaining counsel for the post-conviction proceedings, defendant additionally filed a motion to vacate his convictions and sentence pursuant to section 2—1401 of the Code of Civil Procedure (735 ILCS 5/2—1401 (West 1996)), wherein defendant argued that new evidence, outside the record, indicated that he was unfit to stand trial. After this court's disposition of defendant's direct appeal, defendant, by counsel, filed an amended petition for post-conviction relief with supporting affidavits and exhibits. After hearing argument on the State's motion to dismiss all claims, the trial court, without conducting an evidentiary hearing, dismissed both defendant's post-conviction petition and the section 2—1401 motion to vacate. Pursuant to Supreme Court Rule 651(a) (134 Ill. 2d R. 651(a)), defendant appeals both dismissals, which were subsequently consolidated by this court. For the following reasons, we affirm the circuit court.

## BACKGROUND

This court previously detailed the evidence presented at defendant's trial in our opinion on direct appeal. *People v. Haynes*, 174 Ill. 2d 204 (1996). Therefore, we reiterate only those facts which are germane to the issues raised in this appeal. We set forth in some detail the facts relating to defendant's fitness hearing and the post-conviction proceedings.

Defendant was charged with the murder of Dr. Martin Sullivan, a plastic surgeon, on August 6, 1993. Defendant confessed to the killing after his arrest, stating that he marked Dr. Sullivan for death as part of an overall plan targeting people who promoted "fake Aryan beauty" through plastic surgery, bleached-blonde hair, and blue-tinted contact lenses. Defendant also confessed to the police that he had previously murdered Frank Ringi, a San Francisco hair colorist, and had been stalking Lake Forest executive Charles Stroupe, the president of the largest manufacturer of blue-tinted contact lenses. In his statement to police, defendant related that he targeted Dr. Sullivan based upon the doctor's large advertisement in the Yellow Pages, and made an appointment with him under an assumed name. Defendant shot the doctor at close range in his office to ensure that he had killed the right man.

In March 1994, a hearing was held to determine defendant's fitness to stand trial. Defendant, who was represented by counsel during this hearing, waived his right to a jury, and the proceedings were conducted before the trial judge. The parties did not dispute that defendant understood the nature and purpose of the proceedings against him. The parties disagreed, however, over whether defendant had the capacity to assist in his defense. Expert testimony was adduced by both the State and defendant, and, after hearing the evidence, the trial court concluded that defendant was fit to stand trial.

The State's first witness during the fitness hearing

was Wilmette police officer Matthew McConnell, who testified that he met with defendant on three occasions after defendant's arrest in connection with retrieving blood, hair, fingerprint, palm print, and handwriting samples from him. McConnell stated that during his interactions with defendant, defendant established appropriate eye contact, read the court orders requiring the taking of samples and indicated that he understood the orders, had no difficulty in following the officer's instructions, and cooperated fully with the sampling. Officer McConnell testified that defendant did not appear nervous, did not make unusual movements or twitches, did not wring his hands, did not give irrational responses, and did not delay in responding during conversations with the officers. McConnell also stated that on one occasion he observed defendant confer with his counsel.

Dr. Mathew Markos, a licensed forensic psychiatrist and the acting clinical director of the Psychiatric Institute of the Circuit Court of Cook County, also testified on behalf of the prosecution. Dr. Markos stated that he had previously performed thousands of evaluations to determine a defendant's fitness for trial, and testified that he had examined this defendant on four occasions, pursuant to court orders, between August 1993 and February 1994. Dr. Markos first examined defendant on August 27, 1993, and on that occasion defendant was calm, cooperative, articulate, coherent, and maintained good eye contact, especially when he was responding to the doctor's questions. At no time during this four-hour interview did defendant display any agitation, anxiety, depression, mania or disturbed behavior. Further, Dr. Markos estimated that defendant had high or superior intelligence.

Dr. Markos testified that during this examination, defendant did not display any "looseness of association," which Markos defined as a thought disorder in which the

logical and sequential links between two or more different thoughts become loose or distorted, rendering speech difficult to understand or incomprehensible. Further, Dr. Markos stated that he did not observe any evidence that defendant suffered from perceptual disturbances, such as hallucinations, and when he asked defendant if he had ever previously experienced hallucinations, defendant replied in the negative.

Significantly, Dr. Markos testified that he was unable to detect any evidence of a delusional thinking process in defendant during any of the four examinations he conducted. Dr. Markos defined a delusion as a false belief or conviction which is not amenable to logic or reason, which is out of touch with reality, and which is not in keeping with a person's educational and cultural background. Dr. Markos related that he talked at length with defendant regarding defendant's "philosophy" of Aryan supremacy, and the doctor concluded that defendant's beliefs neither fit the definition of a delusion nor fell within a delusional psychotic process. Rather, Dr. Markos determined that defendant's philosophy was a "highly personalized idiosyncratic belief."

Using the criteria set forth in the Diagnostic and Statistical Manual of Mental Disorders (Third Edition—Revised) (DSMIII-R) at the conclusion of the first examination Dr. Markos diagnosed defendant as having an Axis II personality disorder with schizoid, narcissistic, and paranoid traits. Dr. Markos explained that in psychiatric diagnosis, an Axis II diagnosis is reserved for personality disorders, whereas an Axis I diagnosis is reserved for mental illness. Dr. Markos testified that it was his opinion that defendant was schizoid because he was a loner, aloof, and had very limited social relationships; that defendant was narcissistic because defendant believed that he had a special role to save the white race; and that defendant was paranoid because he had a constant feeling that the

white race was threatened and that fake Aryan beauty would bring about destruction of the race.

Dr. Markos further testified that, under the DSMIII-R criteria, defendant was not suffering from an Axis I schizophrenic disorder. Although Dr. Markos had initially considered the possibility that defendant could be afflicted with such a disorder, based upon defendant's strong family history of mental illness which included schizophrenia, the doctor explained that the DSMIII-R requires the presence of at least two symptoms, one of which must be a prominent delusion, for a diagnosis of schizophrenia. In Dr. Markos' opinion, defendant exhibited no delusions or delusional thinking, nor did he exhibit symptoms of delusional thinking, such as hallucinations, catatonia or incoherence.

Dr. Markos acknowledged that both Dr. Fauteck and Dr. Rabin, also of the Psychiatric Institute, had diagnosed defendant as schizophrenic, and Markos stated that he took these opinions into account in reaching his own diagnosis. Dr. Markos also acknowledged that other doctors at the Cook County jail had diagnosed defendant as suffering from delusional disorders. However, upon his review of defendant's medical records, it was apparent to Dr. Markos that the "delusion" that had been identified by the examiners was defendant's belief in white supremacy and his opposition to fake Aryan beauty. In the opinion of Dr. Markos, the symptoms described by the other examiners did not support a diagnosis of delusional disorder under the criteria of the DSMIII-R.

Dr. Markos testified that his diagnosis was further supported by the fact that, while in custody, defendant was administered various antipsychotic drugs, including Serentil, Mellaril, and Haldol. There was, however, no change in defendant's beliefs as a result of the medications, even when the dosages of the medications were increased. Dr. Markos testified: "What was significant

from the clinical psychiatric standpoint was the fact that [defendant] was thought to have either schizophrenia or a delusional disorder, had received more than four months of treatment with potent antipsychotic medications ***, and these medications did little at all to change any of his beliefs and that was significant to me because had it been a true delusional process, had it been a true schizophrenic process, then from the clinical standpoint I would have expected some degree of improvement, *** I would have seen some remissions with respect to the intensity of his belief or his belief would have disappeared because a true delusion would be amenable to treatment." Dr. Markos on cross-examination acknowledged, however, that drugs will not always cure a delusional disorder.

During his meetings with defendant, Dr. Markos found defendant to have an "excellent comprehension of the nature of the charges pending against him," that defendant was aware of the consequences if he were to be found guilty of the charges, including the possible imposition of the death penalty, and that defendant had a good understanding of the court proceedings and the functions of the court personnel. The doctor also related that when he first examined defendant in August 1993, defendant made it clear that he wished to represent himself during his trial. Based upon this conversation, Dr. Markos concluded that defendant's decision to represent himself was voluntary, that defendant had the capacity to cooperate with counsel, and that defendant chose not to cooperate. According to Dr. Markos, defendant consistently adhered to the decision to represent himself, except on one occasion when defendant told Markos that defendant had decided to cooperate with the public defender as "a legal maneuver." Defendant subsequently decided against this cooperation, however, and returned to his decision to represent himself during the proceedings.

In conclusion, Dr. Markos testified that from the first time he examined defendant, neither his diagnosis nor his opinion as to defendant's fitness to stand trial had changed: defendant had the capacity to cooperate with his attorney, if he chose to do so. In Dr. Markos' opinion, defendant's decisions had always been volitional and not related to any underlying mental disorder.

Defendant presented six witnesses during the fitness proceedings. The first witness to testify was Thomas Verdun, an assistant public defender who was assigned to represent defendant at his August 9, 1993, bond hearing. Verdun testified that prior to the bond hearing, he spoke with defendant for 20 to 30 minutes in an interview room located in the lockup area of the courthouse. During that conversation, defendant did not look directly at Verdun, and instead gave him "a side long glance." According to Verdun, defendant interrupted the judge during the bond hearing in order to make a statement condemning "fake Aryan beauty." Defendant stated he was disgusted by the ugliness of people, and that he was honored to give his life for his cause. Verdun testified that defendant made it clear that he wanted to represent himself, and the judge ordered defendant to undergo a behavioral clinical examination at the Psychiatric Institute.

The next witness to testify was Dr. Rafael Carreira, director of the residential treatment unit of the Cook County jail. Dr. Carreira testified that he examined defendant on September 2, 1993, and, after that 45-minute session, diagnosed defendant as suffering from a delusional disorder. The doctor testified that, in arriving at his diagnosis, he took into account the opinions of the other examiners at the jail who had also diagnosed defendant with a delusional disorder. He also stated that none of the professionals at the jail had diagnosed defendant with schizophrenia, and that he had personally not observed defendant exhibit any schizophrenic symptoms.

Dr. Carreira further testified that defendant had an above-average insight into his condition as a psychiatric patient, his legal situation, his surroundings, and the charges against him, and although defendant's views were contradictory at times, they were not always irrational. Dr. Carreira did not offer an opinion as to whether defendant was fit to stand trial.

The next witness to testify for defendant was Dr. Satinder Brar, a clinical psychologist. Dr. Brar stated that, in her capacity as the coordinator of the residential treatment unit of Cook County jail, she was aware of defendant's mental health status through her supervision of the mental health professional who was assigned to defendant's dorm. Dr. Brar also had one conversation with defendant regarding his Aryan views, during which defendant was very protective of his ideology. Based upon this information, Dr. Brar diagnosed defendant as suffering from the mental illness of delusional disorder, grandiose type. Dr. Brar however, did not diagnose defendant as being schizophrenic. In Dr. Brar's opinion, defendant's delusional disorder rendered him unaware of the consequences of his trial, and it caused him to illogically refuse legal assistance in clarifying his position. Although Dr. Brar opined that defendant was unwilling to cooperate with his defense counsel as a means of protecting his ideological beliefs, Dr. Brar also acknowledged that she had not discussed with defendant his cooperation with his lawyers. Dr. Brar also testified that defendant had no difficulty with day-to-day functioning, and stated that although defendant was prescribed antipsychotic medication, the medication had no impact on his firmly held beliefs.

Dr. Usha Kartan next testified on defendant's behalf. Dr. Kartan, a psychiatrist at the jail, examined defendant on September 4, 1993, and diagnosed him with a delusional disorder, but found that defendant was not schizo-

phrenic. Dr. Kartan also testified that despite being prescribed various antipsychotic drugs, there was no change in defendant's beliefs and thinking. Specifically, Dr. Kartan stated that defendant received three months of therapy with Haldol, a very potent antipsychotic medicine, and it had no effect on defendant's philosophy. The doctor also noted, however, that defendant often refused medications or requested changes in medication. Dr. Kartan did not feel comfortable or qualified to offer an opinion as to whether defendant was capable of cooperating with defense counsel.

Dr. Paul Fauteck, a forensic psychiatrist at the Psychiatric Institute, also testified on defendant's behalf. Pursuant to court order, Dr. Fauteck examined defendant on four occasions between August 19, 1993, and February 15, 1994, and administered psychological tests on two occasions. Dr. Fauteck's first examination of defendant took approximately three hours, during which time the doctor found defendant to be very intense, maintaining unbroken eye contact. However, Dr. Fauteck also found defendant, overall, to be appropriately behaved, and noted no gross abnormalities of behavior at that time. The doctor and defendant discussed defendant's philosophy, and defendant stated that he was alarmed at the increasing ugliness of the American population, and that he believed this was due to the availability of false Aryan cosmetics, specifically referring to plastic surgery, hair coloring, and tinted contact lenses. In addition, defendant conveyed to the doctor his belief that defendant was being tracked by the Anti-Defamation League (ADL), and that the ADL had labeled him as a "very dangerous man." Based upon this initial examination, Dr. Fauteck diagnosed defendant as suffering from the mental illness of delusional disorder, persecutory type. Dr. Fauteck also found defendant to have a mixed personality disorder, schizoid and borderline with obsessive features. However,

despite suffering from these illnesses, Dr. Fauteck also determined that defendant was fit to stand trial.

During Dr. Fauteck's second examination of defendant, Fauteck administered several psychological tests. After analyzing the test results, Dr. Fauteck diagnosed defendant as suffering from the mental illness of schizophrenia, paranoid type. Dr. Fauteck explained that delusions are a prominent feature of paranoid schizophrenia, and, therefore, the prior diagnosis of delusional disorder was not inconsistent with his later diagnosis of schizophrenia. In reaching this diagnosis, Dr. Fauteck testified that he took into account defendant's statements and behavior, defendant's medical records while incarcerated, and a written social background prepared by defendant's parents which showed a history of apparent schizophrenia in the family. Dr. Fauteck also testified that defendant exhibited a marked looseness of association, in that he did not have an internal consistency in his delusions, and that defendant had reported experiencing auditory hallucinations in 1983 while mildly intoxicated. Dr. Fauteck also testified that it is not uncommon for a psychosis to be intractable and nonresponsive to medications; therefore, the fact that medication had no apparent effect upon defendant's beliefs did not alter the doctor's opinion that defendant suffered from a mental illness.

Dr. Fauteck testified that, as a result of further examining defendant, he arrived at the conclusion that defendant was now unfit to stand trial. The doctor testified that defendant fully understood the role of his defense attorney, was able to communicate with his attorney, was able to discuss defense options and strategic decisions, and was able to discuss the question of self-representation. Dr. Fauteck also found defendant to be exceptionally bright, and determined that defendant's mental illness did not impair his ability to understand the charges against him. However, Dr. Fauteck deter-

mined that defendant's mental illness affected defendant's ability to assist counsel in his defense. Dr. Fauteck concluded that defendant's decisionmaking was constricted by his belief that civilization depended upon defendant sacrificing his life to make a statement against fake Aryan beauty, and, therefore, defendant could not view the trial process as it would be viewed by a rational defendant. Defendant stated to Dr. Fauteck that defendant did not wish to be represented by counsel because no one could expound his philosophy as clearly and as well as he could.

On cross-examination, Dr. Fauteck acknowledged that the criteria found in the DSMIII-R for diagnosing schizophrenia are used almost universally in his profession, and that, under the DSMIII-R, more than just a delusion is necessary for a diagnosis of schizophrenia. However, when asked if hallucinations were necessary to make this diagnosis, Dr. Fauteck replied in the negative, and stated that schizophrenia can correctly be diagnosed without a finding of hallucinations. Defendant had no present hallucinations, although Dr. Fauteck believed that there was a report that defendant did suffer from hallucinations in the past. Although Dr. Fauteck had testified that defendant suffered from looseness of association, Dr. Fauteck acknowledged that defendant was not incoherent or catatonic, nor did he have "bizarre" delusions as characterized by the DSMIII-R. Dr. Fauteck testified that schizophrenia is a long-term disabling illness, characterized by a disturbance in normal daily functioning. Dr. Fauteck stated that he believed that defendant exhibited early signs of this illness from about 1978, and that there were periods in defendant's past when defendant's functioning became substantially diminished. However, Dr. Fauteck acknowledged that, as of 1993, defendant worked in a laboratory, that subsequently defendant had been employed by the Bureau of Alcohol, Tobacco and Fire-

arms, and that there was no evidence that defendant's functioning in a work setting had diminished.

Dr. Fauteck further testified on cross-examination that he holds the belief that schizophrenia is 100/% genetic. He acknowledged, however, that this is "definitely not" the belief of everyone who studies schizophrenia. Dr. Fauteck also stated that his opinion on defendant's fitness was predicated on defendant's failure to cooperate with counsel. Dr. Fauteck testified that defendant told him that defendant did not relish the idea of spending the rest of his life in prison and, although defendant did not want the death penalty, if it enabled him to make a statement to the world, he would sacrifice his life for what he believed to be an important cause. Dr. Fauteck admitted that there was nothing irrational about these statements. Dr. Fauteck also testified that defendant did not tell him that defendant was willing to go along with the advice of his counsel as part of "a legal maneuver." Dr. Fauteck admitted that if defendant held that position for any length of time, Fauteck would have to reevaluate his opinion as to defendant's ability to cooperate with defense counsel.

The final witness to testify for defendant was Dr. Michael Gray Rabin, a psychologist at the Psychiatric Institute. Dr. Rabin stated that Dr. Fauteck had requested that he analyze the results of defendant's Minnesota Multiphasic Personality Inventory (MMPI), one of the tests Dr. Fauteck administered to defendant in August, 1993. Based upon Dr. Rabin's interpretation of the test results, the doctor diagnosed defendant as being paranoid schizophrenic. Dr. Rabin also sat in on an examination conducted of defendant by Dr. Fauteck in February 1994, wherein defendant stated that he wanted to use his trial as a forum to present a warning to the American population and to convey the danger to the Aryan race because of fake Aryan beauty. Dr. Rabin testified that defendant

further stated that he did not want to be represented by counsel because his ideas were unique to himself, that only he could understand and fully expound upon these ideas, and that no one else could adequately explain defendant's philosophy to the court.

Based upon his interpretation of the MMPI test, his interview with defendant, a review of the material in defendant's charts including Dr. Fauteck's and Dr. Markos' examinations, police reports, and defendant's social history, Dr. Rabin concluded that defendant's delusional beliefs rendered him unable to cooperate with counsel to a reasonable degree, and therefore defendant was unfit for trial. Dr. Rabin acknowledged, however, that defendant has above-average intelligence, did not have difficulty understanding questions, and was responsive to Dr. Rabin's inquiries. Although Dr. Rabin considered defendant's responses to be illogical at times, Dr. Rabin did not have difficulty understanding them.

Dr. Rabin also acknowledged that, although defendant had been prescribed various potent antipsychotic drugs, defendant's thinking and beliefs were not changed in any way. Dr. Rabin additionally acknowledged that just because a person is diagnosed as schizophrenic does not necessarily mean that he is unfit for trial, and just because a person has a delusion does not necessarily prevent him from cooperating with defense counsel if he chooses to do so.

In rebuttal, the State called Dr. Markos, who testified that defendant deviated from his desire to represent himself only as part of what defendant termed a "legal maneuver," which defendant believed would speed up the court proceedings. However, defendant decided against cooperating with counsel after his case had been delayed on several occasions. Dr. Markos concluded that defendant's temporary change in his desire to represent himself was a purely voluntary decision, and was not related to any underlying mental disorder.

At the conclusion of the fitness hearing, the circuit court noted that the sole issue was whether defendant was capable of cooperating with counsel in his own defense. In holding that defendant was fit to stand trial, the trial court judge found that "[t]he law does not proscribe a trial where although suffering from a mental disease an individual will not, and I underscore that, assist in his defense," and that the fact that an individual has deep-seated beliefs does not render that person "unable" to assist counsel who may not hold or agree with those beliefs. Therefore, the trial court judge determined that defendant was fit to stand trial. This court affirmed that finding on direct appeal. *People v. Haynes*, 174 Ill. 2d 204 (1996).

Defendant waived counsel for trial and sentencing, although the trial court appointed the public defender as standby counsel during the proceedings. As part of the State's case in chief, defendant's handwritten diary was read into the record. The diary contained details of defendant's murder of Dr. Sullivan and his stalking of Charles Stroupe. The State also played a cassette tape marked "taped confession" which the police found upon searching defendant's apartment. In this tape defendant described his murders and his motivation for those crimes. Defendant had intended to send the tape to cosmetic industry executives to warn them against producing "fake Aryan cosmetics." The State also presented defendant's oral and written confession to the police. Defendant, acting as his own counsel, posed no questions to the State's witnesses, and his defense consisted essentially of making statements of his "Aryan beauty" philosophy. After being sworn as a witness, defendant testified as follows: "I have never denied that I shot Dr. Martin Sullivan. I confess that I did that. I wanted to make a statement. I condemn the fake Aryan cosmetics, bleached blond hair, blue tinted contact lenses, and plastic surgery."

The circuit court found defendant guilty of all charges. Subsequently, the court found defendant eligible for the death penalty on the grounds that defendant intentionally killed Dr. Sullivan during the course of a burglary (720 ILCS 5/9—1(b)(6) (West 1992)) and that defendant killed Dr. Sullivan in a cold, calculated and premeditated manner (720 ILCS 5/9—1(b)(11) (West 1992)).

At the aggravation-mitigation stage of the sentencing proceedings, the State again called Dr. Markos, who opined that defendant was not under the influence of an extreme mental or emotional disturbance at the time of the crime. Dr. Markos also testified that defendant lacked regret or remorse, gave very coherent and detailed accounts of the offense, and was of above-average intelligence. The State also introduced evidence of defendant's confession to his prior murder of hair colorist Frank Ringi, given to San Francisco police detectives on August 12, 1993, after defendant's murder of Dr. Sullivan. Defendant presented no evidence in mitigation and gave only a brief statement reiterating his philosophy condemning fake Aryan beauty. The trial court found no mitigating factors to preclude the imposition of the death penalty, and sentenced defendant to death.

During the pendency of the direct appeal of defendant's conviction and sentence to this court, defendant, on December 21, 1995, filed a *pro se* petition for post conviction relief, wherein he alleged that his constitutional rights were violated during the fitness hearing, trial, and sentencing. Among other allegations, defendant stated that he was denied effective assistance of counsel during the fitness hearing, and that the State violated due process and defendant's right to a fair trial by not disclosing certain information during that hearing.

In April 1996, defense counsel was appointed for the

post-conviction proceedings. On May 6, 1996, counsel filed a petition to vacate defendant's convictions and death sentence pursuant to section 2—1401 of the Code of Civil Procedure (735 ILCS 5/2—1401 (West 1996)) based upon newly discovered information outside of the record. Counsel attached affidavits and other documents of later-discovered evidence which, it was argued, would probably have changed the result of the fitness hearing. These documents indicated that, two days after defendant was sentenced to death, defendant was examined at Pontiac Correctional Center and diagnosed as suffering from an Axis I psychotic disorder. One of the documents submitted in support of this petition was the affidavit of Dr. Kwan-Bon Jin, who subsequently diagnosed defendant as suffering from an Axis I psychosis of either delusional disorder or schizophrenia. The documents also indicate that when Dr. Jin increased defendant's dosage of Haldol, defendant showed significant improvement until November 19, 1994, when Dr. Jin observed defendant to be free from delusional behavior.

On February 28, 1997, post-conviction counsel filed an amended post-conviction petition. Among other claims, the petition alleged that defendant's trial counsel was ineffective for failing to present certain evidence at the fitness hearing. Defendant attached various documents indicating that he was diagnosed and treated for schizophrenia at the San Mateo County Mental Health Services in California during 1982 and 1983. The admitting documents show that defendant at the time stated that he had previously had symptoms of hearing voices. The evidence also included a document prepared by defendant's parents, showing a family history of mental illness which included schizophrenia, and affidavits of relatives, friends, and acquaintances relating their observations concerning defendant's past behavior.

The amended post-conviction petition also alleged

that the State improperly withheld certain evidence until after the fitness hearing, in violation of *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). The allegedly withheld evidence consisted of defendant's handwritten diary and the audio tape marked "taped confession" used at trial, the confession made by defendant to detectives from the San Francisco police department used at sentencing, and the medical records of defendant's diagnosis and treatment after trial at Pontiac Correctional Center by Dr. Jin and others.

On February 11, 1998, after argument of counsel, the trial court granted the State's motion to dismiss the post-conviction petition without an evidentiary hearing. The post-conviction judge noted that Dr. Markos, a well-respected psychiatrist, testified at length during the fitness proceedings with regard to his knowledge of defendant's psychiatric history, defendant's family's psychiatric history, and the reports of the other professionals who had examined defendant. Based upon this information, the court noted, Dr. Markos concluded that defendant was aware of the charges against him as well as the possible consequences of those charges, and that although defendant was able to cooperate with counsel, defendant made a voluntary choice not to cooperate.

The post-conviction judge found that Dr. Markos' opinion was "bolstered by what occurred subsequent to the fitness hearing when the defendant chose to represent himself based on the articulated reason that only he was aware of the political philosophy that he was trying to get out to the public, and that no one was in a better position than he to insure that that occurred." The post-conviction judge further found that Dr. Markos' opinion that defendant was able to cooperate with counsel, and thus was fit to stand trial, was substantiated and corroborated by the fact that despite being administered psychotropic medication, that medication had absolutely

no effect on defendant's desire to continue to preach about his political philosophy.

In regard to the alleged *Brady* violations, the post-conviction judge held that an affidavit filed by the assistant State's Attorney who prosecuted this case, Bruce Paynter, indicated that all discovery was tendered to the defense. Further, attached to Paynter's affidavit was a memo written by Assistant Public Defenders Bernard Sarley and Crystal Marchiagianni to the Psychiatric Institute that they had "all kinds" of discovery at their disposal should the Institute wish to view it for purposes of rendering an opinion. Further, the post-conviction judge noted that the fitness hearing was completed on March 4, 1994, and within six weeks the trial began. At the trial, the State introduced the very evidence that defendant claims the defense never had, and the judge observed that there is no evidence in the record that there was an objection or a claim of a *Brady* violation.

The post-conviction judge then heard brief argument of counsel on the section 2—1401 petition and dismissed that petition as well. Defendant filed notices of appeal from both denial orders. These appeals have been consolidated.

## ANALYSIS

### Section 2—1401 Petition

Defendant first contends that the post-conviction judge erred in denying his section 2—1401 petition to vacate his convictions and death sentence based on newly discovered evidence, without first conducting an evidentiary hearing. Section 2—1401 of the Code of Civil Procedure (735 ILCS 5/2—1401 (West 1996)) provides a comprehensive statutory procedure by which final orders, judgments, and decrees may be vacated after 30 days from their entry. Although a section 2—1401 petition is usually characterized as a civil remedy, its remedial pow-

ers extend to criminal cases. *People v. Sanchez*, 131 Ill. 2d 417, 420 (1989). A section 2—1401 petition for relief from a final judgment is the forum in a criminal case in which to correct all errors of fact occurring in the prosecution of a cause, unknown to the petitioner and court at the time judgment was entered, which, if then known, would have prevented its rendition. *People v. Berland*, 74 Ill. 2d 286, 313-14 (1978); *People v. Hinton*, 52 Ill. 2d 239, 243 (1972). A section 2—1401 petition, however, is "not designed to provide a general review of all trial errors nor to substitute for direct appeal." *Berland*, 74 Ill. 2d at 314. Points previously raised at trial and other collateral proceedings cannot form the basis of a section 2—1401 petition for relief. *Berland*, 74 Ill. 2d at 314-15. When examining a trial court's ruling on a section 2—1401 petition, the appropriate standard of review is whether the trial court abused its discretion. *Sanchez*, 131 Ill. 2d at 420. Absent an abuse of discretion, the trial court's determination will not be disturbed. *Sanchez*, 131 Ill. 2d at 420.

The gist of defendant's section 2—1401 petition is that, had the trial court known of the evidence newly discovered by defendant, this evidence would have precluded the court from ruling that defendant was fit to stand trial and, in turn, would have prevented defendant from being convicted and sentenced to death. Defendant contends that this new evidence undermines Dr. Markos' opinion that defendant was fit, to the extent that immediately following his convictions and sentencing, defendant was diagnosed as suffering from an Axis I psychotic disorder, and that defendant's delusions responded to medication administered at an appropriately higher level. We reject defendant's arguments.

The evidence presented by defendant in support of his section 2—1401 petition consists of events occurring subsequent to defendant's conviction and the imposition

of his death sentence on May 4, 1994. Defendant was thereafter transferred to Pontiac Correctional Center and, on May 6, 1994, was given a preliminary mental health evaluation wherein he was diagnosed as suffering from an Axis I psychotic disorder. Dr. Kwan-Bon Jin, a psychiatrist employed at Pontiac, submitted an affidavit in support of defendant's 2—1401 petition stating that he began treating defendant in June 1994, and subsequently diagnosed defendant as suffering from an Axis I disorder, either delusional disorder or schizophrenia. In his affidavit, Dr. Jin stated that during his interactions with defendant, he observed strong delusional content in defendant's thinking, as well as looseness of association of defendant's thoughts.

In addition, defendant relies upon Dr. Jin's affidavit, as well as an affidavit submitted by Dr. Jonathan Lipman, a neuropharmacologist specializing in the effect of drugs on the brain, to show that defendant's delusions responded to medication when the medication was increased to a higher dosage than defendant had been administered at the time of his fitness hearing.

Specifically, in accordance with his diagnosis of an Axis I mental illness, Dr. Jin increased defendant's daily intake of Haldol to 10 mg. At this increased level of medication, Dr. Jin observed significant improvement to defendant's condition and, by November, 1994, Dr. Jin found defendant to be free of delusional behavior. In his affidavit, Dr. Jin stated that, based upon his observations, "it appears that [defendant's] delusional and psychotic symptomology was brought under control as a result of increasing and maintaining his dosage of Haldol at 10 milligrams." Similarly, Dr. Lipman concluded, based upon his review of defendant's medical records and treatment records, that "given the documented response [defendant] later demonstrated" to an increased daily dosage of Haldol, defendant's previous Haldol dosage "in

retrospect \*\*\* was subeffective for treatment of his delusional and psychotic state at the time of his legal proceedings."

As stated, the purpose of a section 2—1401 petition is to bring facts to the attention of the circuit court which, if known at the time of judgment, would have precluded its entry. See *Smith v. Airoom, Inc.*, 114 Ill. 2d 209, 220-21 (1986); *Berland*, 74 Ill. 2d at 313-14; *Hinton*, 52 Ill. 2d at 243. Therefore, a general rule has developed that section 2—1401 is available "for relief based on matters which antedate the rendition of the judgment and not those which arise subsequent to its rendition." *Russell v. Klein*, 58 Ill. 2d 220, 225 (1974). The new evidence proffered by defendant in support of his section 2—1401 petition consists of events occurring subsequent to defendant's conviction and death sentence. Specifically, Dr. Jin's opinion that defendant suffers from an Axis I mental illness, and his statement that defendant responded to increased dosages of medication is based upon the doctor's observations concerning defendant's mental state during the period after the trial court's judgment. Significantly, Dr. Jin's affidavit gives no opinion as to defendant's fitness for trial in March 1994. Similarly, the conclusions stated by Dr. Lipman in his affidavit are based upon factors occurring subsequent to defendant's conviction and sentencing. Because this evidence did not exist at the time of defendant's fitness hearing in March 1994, and therefore could not have been presented to the trial court for its consideration during those proceedings, it does not provide a proper basis for relief pursuant to a section 2—1401 petition. See *Russell*, 58 Ill. 2d at 225.

In addition, even if defendant's proffered evidence was a proper basis for a section 2—1401 petition, defendant has failed to establish that this evidence would have changed the outcome of the fitness hearing. Five experts testified during the fitness proceedings that defendant

suffered from either a delusional disorder and/or schizo-phrenia. Therefore, we cannot discern how Dr. Jin's sim-ilar findings would have altered the outcome of the proceedings. See *Berland*, 74 Ill. 2d at 316; *People v. Gandy*, 227 Ill. App. 3d 112, 139-41 (1992); *People v. Lambert*, 23 Ill. App. 3d 615, 619-20 (1974). Accordingly, we find that the circuit court properly dismissed defendant's section 2—1401 petition without an evidentiary hearing.

## Post-Conviction Petition

Defendant next argues that the circuit court erred in dismissing, without an evidentiary hearing, the claims in his post-conviction petition that the State failed to dis-close certain evidence to the defense in violation of *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), and that defendant was denied effective as-sistance of trial and appellate counsel.

The Illinois Post-Conviction Hearing Act provides a mechanism by which criminal defendants can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution, the Illinois Constitution, or both. See 725 ILCS 5/122—1 (West 1994). An action for post-conviction relief is a col-lateral proceeding, not an appeal from the underlying conviction and sentence. *People v. Williams*, 186 Ill. 2d 55, 62 (1999); *People v. Brisbon*, 164 Ill. 2d 236, 242 (1995). In order to be entitled to post-conviction relief, a defendant must establish a substantial deprivation of federal or state constitutional rights in the proceedings that produced the judgment being challenged. *People v. Tenner*, 175 Ill. 2d 372, 378 (1997).

The purpose of a post-conviction proceeding is to permit inquiry into constitutional issues involved in the original conviction and sentence that were not, and could not have been, adjudicated previously upon direct appeal. *People v. Towns*, 182 Ill. 2d 491, 502 (1998); *People v. Griffin*, 178 Ill. 2d 65, 72-73 (1997). The doctrine of *res*

*judicata* bars consideration of issues that were raised and decided on direct appeal. *Towns*, 182 Ill. 2d at 502; *Griffin*, 178 Ill. 2d at 73. Further, issues that could have been presented on direct appeal, but were not, are deemed waived for purposes of post-conviction review. *Towns*, 182 Ill. 2d at 503; *Griffin*, 178 Ill. 2d at 73. These rules are relaxed, however, where the facts relating to the post-conviction claim do not appear on the face of the original record. See *People v. Whitehead*, 169 Ill. 2d 355, 372 (1996); *People v. Eddmonds*, 143 Ill. 2d 501, 528 (1991); *People v. Owens*, 129 Ill. 2d 303, 308 (1989).

An evidentiary hearing on post-conviction claims is warranted only where the allegations of the post-conviction petition, supported where appropriate by the trial record or accompanying affidavits, make a substantial showing that a defendant's constitutional rights have been violated. *People v. Morgan*, 187 Ill. 2d 500, 528 (1999); *Towns*, 182 Ill. 2d at 503. In determining whether to grant an evidentiary hearing, all well-pleaded facts in the petition and in any accompanying affidavits are taken as true. *Morgan*, 187 Ill. 2d at 528; *Towns*, 182 Ill. 2d at 503. A trial court's determination regarding the sufficiency of the allegations contained in a post-conviction petition are reviewed *de novo*. *Morgan*, 187 Ill. 2d at 528; *People v. Coleman*, 183 Ill. 2d 366, 389 (1998).

### Brady Claim

Defendant contends that his constitutional right to due process of law was violated because the State failed to disclose to the defense certain exculpatory evidence as required by *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). Defendant argues that the State violated the *Brady* rule when it failed to disclose four items of evidence prior to the fitness hearing: defendant's handwritten diary; the audio cassette marked "taped confession" found by police in defendant's apartment wherein defendant described his murders and his

motivation for them; the transcript of his audio taped interview by San Francisco police on August 12, 1993, wherein defendant recounted his murder of Frank Ringi and stated that he believed he was under surveillance by the ADL; and the medical records from Pontiac Correctional Center indicating that on May 6, 1994, defendant was diagnosed with a psychotic disorder, and on June 1, 1994, defendant was diagnosed with an Axis I mental illness.

In *Brady*, the United States Supreme Court required that the prosecution disclose evidence that is both favorable to the accused and "material either to guilt or to punishment." *Brady*, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1196; *People v. Sanchez*, 169 Ill. 2d 472, 485-86 (1996). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 87 L. Ed. 2d 481, 494, 105 S. Ct. 3375, 3383 (1985); *Sanchez*, 169 Ill. 2d at 486.

Defendant contends that the post-conviction judge erred in denying an evidentiary hearing on his *Brady* claim. For the purpose of determining whether to grant an evidentiary hearing, all well-pleaded facts in the post conviction petition and any accompanying affidavits are taken as true. *Coleman*, 183 Ill. 2d at 381; *People v. Hobley*, 182 Ill. 2d 404, 428 (1998). According to defendant, the above-described evidence allegedly withheld by the State prior to the fitness hearing was material to the proceedings "because [it] contain[ed] examples of conduct Dr. Markos testified he had not observed in the petitioner during their sessions," and "[a]t the very least, this was relevant information for the cross-examination of Dr. Markos; it should arguably also have had an impact on his fitness determination in that this evidence should have caused him to rethink his diagnosis." Defendant

also asserts that his handwritten diary and his statements are material because they present defendant's "view of the world and his way of thinking through his own words."

In support of his *Brady* claim, defendant relies upon an affidavit filed by Bernard Sarley, defendant's counsel during the fitness proceedings, in which counsel states that the diary and defendant's statements were not tendered by the State prior to the fitness hearing, that counsel "never saw" these items from the time of his appointment "through my representation of Mr. Haynes," and that counsel would have used this evidence to support the contention that defendant was unfit to stand trial. We find that the affidavit filed by defense counsel constitutes new information which was not in the original trial record, and, therefore could not have been addressed by a reviewing court on direct appeal. Because the rules of procedural default are relaxed where the facts relating to a defendant's claim do not appear on the face of the original record (see *Whitehead*, 169 Ill. 2d at 372; *Eddmonds*, 143 Ill. 2d at 528; *Owens*, 129 Ill. 2d at 308), we address the merits of this post conviction claim.

Taking, as we must, defendant's allegations of fact to be true, we hold that the circuit court properly dismissed defendant's *Brady* claims without an evidentiary hearing. Defendant has failed to make a substantial showing that there is a reasonable probability that the diary, the "taped confession," and the statements made by defendant to the San Francisco police would have altered the outcome of the fitness hearing. Although defendant maintains that these three items of evidence establish that he was "delusional" at the time of Dr. Sullivan's murder, we disagree. A review of this evidence indicates that defendant was fully aware of his actions, as well as of the consequences of these actions.

Defendant's handwritten diary provides a day-by-day

account of his activities shortly before and after the Sullivan murder. In many of the entries defendant recounts his methodical stalking of Charles Stroupe, revealing that defendant kept Stroupe's house under surveillance in order to ascertain the best opportunity to kill Stroupe, that, using assumed identities, defendant repeatedly telephoned the Stroupe household to determine Stroupe's whereabouts, and that defendant concocted various cover stories in the event he was stopped by the police. At one point, defendant wrote that he believed that he had "scared off" Stroupe, and that "I'm starting to wish that I'd just walked up and rung the doorbell. Let him have a few slugs right in the belly. Too late now. (Would've saved a lot of time and money)." On August 7, 1993, the day after defendant killed Dr. Sullivan, defendant wrote that "[y]esterday I did the deed, and I feel that the stain of cowardice has washed off my shirt." Defendant related that his murder of Dr. Sullivan was "somewhat messy" and that he "[h]ad a clear shot at his head and missed. Used up all 6 bullets." Reflecting on the consequences of his actions, defendant wrote that his "decision to face the possibility of prison rape takes courage," but that he had committed himself "too deeply to back out now." Remarks similar to those found in defendant's diary are contained in the audio cassette recording labeled "taped confession," and in the transcript of the taped statement defendant made to the San Francisco police.

We conclude that, far from supporting defendant's contention that, as required under *Brady*, these items of evidence were both favorable to defendant and material to the proceedings because they contained evidence of "delusional" thinking, a review of these three items leads to the conclusion that defendant is a methodical stalker and a calculating and ruthless killer. On this record, defendant has failed to make a substantial showing that there is a reasonable probability that the above-described

evidence would have affected the outcome of the fitness hearing. Accordingly, we reject defendant's *Brady* claim as to these evidentiary items.

We likewise reject defendant's contention that the State violated the *Brady* rule when the State failed to disclose medical records from Pontiac Correctional Center indicating that, after defendant was convicted and sentenced to death, he was diagnosed as suffering from an Axis I mental illness. This argument is unavailing because in the previous argument defendant claims that such information constituted "new evidence" and was not available until after defendant's trial. If the information was unavailable for the proceedings, it cannot be said that the State failed to disclose the information in violation of *Brady*. See *People v. Hinton*, 302 Ill. App. 3d 614, 623 (1998). We find that the circuit court properly dismissed this claim.

### Ineffective Assistance of Counsel Claims

Defendant next argues that the circuit court erred in dismissing, without an evidentiary hearing, defendant's claim that he was denied effective assistance of counsel at the fitness hearing. Defendant contends that counsel was ineffective during the fitness proceedings in failing to present specific evidence, which, according to defendant, establishes that he was unfit to stand trial. First, defendant claims that his attorney failed to introduce defendant's handwritten diary during the fitness proceedings. Second, defendant maintains that defense counsel failed to present documentary evidence of the history of mental illness in defendant's family. Third, defendant asserts that his attorney failed to present testimony from defendant's family, friends, and acquaintances regarding defendant's past impairment in the areas of self-care, work functioning, family functioning and social life. Finally, defendant contends that counsel failed to introduce defendant's mental health records from the early 1980s.

We first address defendant's claim that counsel was ineffective for failing to introduce defendant's diary during the fitness proceedings. In the prior argument, defendant alleged that the State violated the *Brady* rule by failing to tender this diary to defense counsel prior to the fitness hearing. In support of that claim, defendant filed the affidavit of his trial attorney, who averred that he did not have defendant's diary in his possession at the time of the fitness proceedings. Accepting, as we must, the veracity of defense counsel's statement (see *Coleman*, 183 Ill. 2d at 381; *Hobley*, 182 Ill. 2d at 428), we hold that defendant has not presented a cognizable post-conviction claim with respect to his diary. Defendant cannot claim that counsel was ineffective for failing to present evidence that was not tendered to him. Therefore, the circuit court properly dismissed this claim.

We also find that defendant has failed to present a cognizable post-conviction claim with respect to counsel's alleged failure to present evidence of the history of mental illness in defendant's family. Our review of the record reveals that both Dr. Markos and Dr. Fauteck testified at length during the fitness proceedings regarding the incidence of mental illness in defendant's family and the impact of this family background upon defendant's mental health. Dr. Markos testified that defendant's parents had supplied written information detailing a history of mental illness in defendant's family, including incidences of schizophrenia, and that Markos had taken this family history into account in forming his opinion as to defendant's fitness. Similarly, Dr. Fauteck also testified that he reviewed the written social history supplied by defendant's parents detailing incidences of mental illness in defendant's family. Dr. Fauteck stated that, in his view, schizophrenia is 100/% genetic, and that he used this background information in arriving at his conclusion that defendant suffered from schizophrenia and was unfit

for trial. In addition, the information supplied by defendant's parents concerning a history of mental illness in defendant's family was specifically considered in this court's opinion on defendant's direct appeal. *Haynes*, 174 Ill. 2d at 229.

Defendant similarly complains that, during the fitness hearing, his trial counsel failed to introduce evidence concerning defendant's past impairment in the areas of self-care, work functioning, family functioning and social life. However, our review of the record discloses that during the fitness proceedings, defendant's expert, Dr. Fauteck, testified that there were periods in the past when defendant's functioning became substantially diminished. Dr. Fauteck surmised that these periods coincided with the active phases of defendant's mental illness. Accordingly, we hold that this claim is not a cognizable post-conviction claim.

In sum, the record reveals that the evidence cited by defendant in the two above-detailed claims was before the court during the fitness proceedings. Defendant cannot now claim that counsel was ineffective for failing to present evidence which was already part of the record. Therefore these two claims were properly dismissed by the circuit court.

Defendant also contends that his trial counsel was ineffective during the fitness proceedings for failing to produce defendant's prior mental health records. Defendant contends that these records, which date from the early 1980s in California, not only show that he had previously been treated for psychotic symptoms, including auditory hallucinations and delusions, but also reveal that, in 1984, defendant had been diagnosed as suffering from chronic schizophrenia. We find that defendant's prior mental health records constitute new information which was not contained within the original trial court record and, therefore, could not have been considered by

a reviewing court on direct appeal. We accordingly address the merits of this specific post-conviction claim. See *People v. Steidl*, 177 Ill. 2d 239, 250-51 (1997); *People v. Britz*, 174 Ill. 2d 163, 177 (1996).

As stated, a defendant is not entitled to an evidentiary hearing on his post-conviction petition as a matter of right. An evidentiary hearing is warranted only where the allegations of the post-conviction petition, supported where appropriate by the trial record or accompanying affidavits, make a substantial showing that a defendant's constitutional rights have been violated. *Morgan*, 187 Ill. 2d at 528; *Towns*, 182 Ill. 2d at 503; *Owens*, 129 Ill. 2d at 308. In determining whether to grant an evidentiary hearing, all well-pleaded facts in the petition and in any accompanying affidavits are taken as true. *Morgan*, 187 Ill. 2d at 528; *Towns*, 182 Ill. 2d at 503. We review a trial court's determination regarding the sufficiency of the allegations contained in a post-conviction petition *de novo*. *Morgan*, 187 Ill. 2d at 528; *Coleman*, 183 Ill. 2d at 388-89.

The constitutional guarantee of the assistance of counsel (U.S. Const., amends. VI, XIV) includes the right to effective assistance of counsel (*Cuyler v. Sullivan*, 446 U.S. 335, 344, 64 L. Ed. 2d 333, 343-44, 100 S. Ct. 1708, 1716 (1980)), both at trial and on a defendant's first appeal as of right. *Evitts v. Lucey*, 469 U.S. 387, 396-97, 83 L. Ed. 2d 821, 830-31, 105 S. Ct. 830, 836-37 (1985). Claims alleging ineffective assistance of counsel are judged under the standard set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). *Coleman*, 183 Ill. 2d at 397. To prevail on a claim asserting that counsel was not effective, a defendant must first establish that his defense counsel's performance was deficient in that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defen-

dant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. A defendant must establish that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Because judicial scrutiny of a defense counsel's performance is highly deferential, "a defendant must overcome the strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not of incompetence." *Coleman*, 183 Ill. 2d at 397.

If a defendant establishes that defense counsel's representation fell below an objective standard of reasonableness, then a defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

A defendant must satisfy both prongs of the *Strickland* test before he or she can prevail on a claim of ineffective assistance of counsel. However, if the ineffective assistance claim can be disposed of on the ground that the defendant did not suffer prejudice, a court need not determine whether counsel's performance was constitutionally deficient. *Griffin*, 178 Ill. 2d at 74.

Attached to defendant's post-conviction petition are copies of records prepared by the San Mateo Mental Health Services, dated September 1982 to May 1984. The documents, entitled "adult admission summary," "patient activity record and progress notes," and "record of drug treatment," indicate that defendant was referred for mental health services by the probation department as part of his sentence for a conviction of misdemeanor malicious mischief, and reveal that defendant reported

hearing voices in his past, that defendant was diagnosed as suffering from schizophrenia by Kaiser Medical Center, and that defendant was treated with various psychotropic drugs. Also attached to the post-conviction petition is a patient progress note from Kaiser Medical Center, dated December 12, 1982, which contained the diagnosis that defendant suffered from "schizophrenia chronic."

According to defendant, this newly discovered evidence "contradicts and undermines" Dr. Markos' testimony and conclusion that defendant was fit to stand trial. Specifically, defendant contends that this evidence could have verified that defendant had a long history of mental illness, including schizophrenia, and that defendant suffered from auditory hallucinations. Defendant argues that "had Dr. Markos been confronted with this evidence during his testimony, it is possible that he would have agreed that [defendant] did suffer from a psychotic illness, and found him unfit for trial." Therefore, defendant concludes, the circuit court erred in dismissing this claim without conducting an evidentiary hearing.

We disagree. Based upon the record in this matter, we conclude that defendant has failed to make a substantial showing that, had counsel introduced defendant's prior mental health records, there is a reasonable probability that the outcome of the fitness proceedings would have been different. During the fitness hearing, Dr. Markos testified in detail concerning his personal examinations of defendant. Markos stated that he examined defendant on four occasions, with their first session occurring on August 27, 1993, shortly after defendant killed Dr. Sullivan, and their last session occurring in February 1994, shortly before the fitness hearing. Based upon his personal observations of defendant during this period, Dr. Markos found that defendant was capable of cooperating with defense counsel and that defendant had

made a voluntary choice not to cooperate with his attorney. Dr. Markos' opinion that defendant was fit for trial was largely premised upon the facts that, between August 1993 and February 1994, defendant was not suffering from delusions and that his beliefs did not change in response to medication. Therefore, evidence that defendant was diagnosed with schizophrenia in 1982 was not particularly relevant to the question of defendant's mental state in 1994, when he was tried. See *Eddmonds*, 143 Ill. 2d at 522. In addition, Dr. Markos testified that, in arriving at his opinion, he took into consideration the contrary opinions of his colleagues, including Dr. Fauteck, who, during the fitness proceedings, referenced information similar to that contained in defendant's prior mental health records. During the hearing, Dr. Fauteck testified that there "were reports" that defendant had suffered from auditory hallucinations in 1983, and that defendant showed signs of schizophrenia starting as early as 1978. Nevertheless, Dr. Markos concluded that, based upon the criteria found in the DSMIII-R, defendant was not suffering from a mental illness and was fit for trial. We hold that the circuit court properly dismissed this claim.

As his final contention, defendant maintains that the circuit court erred in dismissing, without an evidentiary hearing, his allegation that he was denied effective assistance of appellate counsel. Relying upon the United States Supreme Court's decision in *Estelle v. Smith*, 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866 (1981), defendant claims that his rights under the fifth and sixth amendments of the United States Constitution, as well as under article I, sections 2 and 8, of the Illinois Constitution, were violated when, prior to the examinations conducted by Dr. Markos, neither the trial court nor defense counsel advised defendant that he had the right to remain silent and that statements made by him in the

course of the examination could later be used against him during the sentencing proceedings.

Subsequently, Dr. Markos, based upon information gathered during his evaluations of defendant, testified for the State in aggravation at sentencing.

Defendant contends that his appellate counsel was ineffective for failing to raise this claim on direct appeal. Although this issue could have been raised on direct appeal, the waiver doctrine is inapplicable where, as here, a defendant asserts that the alleged waiver stems from ineffective assistance of appellate counsel. *People v. Winsett*, 153 Ill. 2d 335, 346 (1992); *People v. Flores*, 153 Ill. 2d 264, 282 (1992). Like claims alleging deprivation of effective assistance of trial counsel, claims of ineffective assistance of appellate counsel are also evaluated under the two-prong standard set forth in *Strickland. People v. Ward*, 187 Ill. 2d 249, 258 (1999); *People v. Pecoraro*, 175 Ill. 2d 294, 333 (1997). "A defendant who contends that appellate counsel rendered ineffective assistance, *e.g.*, by failing to argue an issue, must show that the failure to raise that issue was objectively unreasonable and that the decision prejudiced the defendant. Appellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong. Accordingly, unless the underlying issues are meritorious, defendant has suffered no prejudice from counsel's failure to raise them on appeal. *People v. Childress*, 191 Ill. 2d 168, 175 (2000); *People v. West*, 187 Ill. 2d 418, 435 (1999) (and cases cited therein)." *People v. Easley*, 192 Ill. 2d 307, 329 (2000). We now turn to the merits of defendant's argument.

In *Estelle*, the defendant, awaiting trial for murder, was ordered by the trial court to submit to a pretrial examination by a psychiatrist for the purpose of determin-

ing his competency to stand trial. The defendant was interviewed by the psychiatrist and, in a letter to the trial court, the psychiatrist found that the defendant was competent to stand trial. The trial commenced and the defendant was convicted of murder. Thereafter, at the sentencing phase of the defendant's death penalty hearing, the State called as its sole witness the psychiatrist who had previously examined the defendant at the court's request. The psychiatrist described defendant's severe sociopathic condition, expressed the opinion that the defendant could not be remedied by treatment, and concluded that the defendant would continue to be dangerous in the future. The psychiatrist's opinion concerning the dangerousness of the defendant was not based merely upon his observations of defendant, but upon detailed descriptions of defendant's statements about the underlying crime. Under the then-existing Texas capital sentencing procedure, the question of a defendant's "future dangerousness" was one of three requisite questions which, if answered in the affirmative by the sentencing body, resulted in the mandatory imposition of the death penalty. Given these facts, the Court held that "[a] criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." *Estelle*, 451 U.S. at 468, 68 L. Ed. 2d at 372, 101 S. Ct. at 1876.

We find that the distinct circumstances present in *Estelle* render that decision distinguishable from the matter at bar for several reasons. The Court's decision in *Estelle* was animated by the concern that the psychiatrist was acting as an agent of the State, eliciting incriminating statements from a defendant in a post-arrest custodial setting without providing *Miranda* warnings, and then using those incriminating statements in support of

sentencing the defendant to death. *Estelle*, 451 U.S. at 469, 68 L. Ed. 2d at 373, 101 S. Ct. at 1876. Those same concerns are not present in the instant matter. The record reveals that, at sentencing, Dr. Markos testified that defendant suffered from a personality disorder and not from a mental illness, that during his examinations defendant was articulate and intelligent, that defendant's highly personal and idiosyncratic beliefs are related to his personality, and that these beliefs are not affected by medication. Dr. Markos also testified that the statements made by defendant to the police immediately following his arrest for the Sullivan murder supported his diagnosis because defendant's lack of remorse concerning his crimes is symptomatic of a personality disorder rather than a mental illness. In conclusion, Dr. Markos testified that, at the time of the offense, defendant did not suffer from any extreme mental or emotional disturbance which would have substantially impaired his ability to appreciate the criminality of his actions. Not only had the content of Dr. Markos' testimony already been introduced before the trial court judge during the fitness proceedings, but throughout the trial defendant himself repeatedly reminded the judge of the nature and motivation of his crimes, freely admitted that he had committed the crimes, and showed no remorse for his conduct. Therefore, we cannot discern how defendant's right against self-incrimination was violated by Dr. Markos' testimony when defendant, of his own volition, had already placed this information into the record himself.

*Estelle* is additionally distinguishable on the basis that the psychiatric testimony in that case was initially introduced by the State at the sentencing hearing to carry its burden of proof of showing that the defendant would be dangerous in the future, a proposition that was required to be established under the death penalty law of Texas at that time. In the present case, in contrast, Dr.

Markos merely testified that defendant was fit and that he was not suffering from a mental disease. Thus, unlike in *Estelle*, the prosecution in the matter at bar was not using evidence obtained in the challenged interviews to fulfill a burden of proof or persuasion under the death penalty statute. See *People v. Mahaffey*, 166 Ill. 2d 1, 28 (1995).

Furthermore, the result in *Estelle* was premised on the fact that, in that case, defense counsel had not been previously notified about the scope of the psychiatric examination, or even of its existence, thereby depriving the defendant of the opportunity to discuss the examination with counsel. *Estelle*, 451 U.S. at 469, 68 L. Ed. 2d at 373, 101 S. Ct. at 1876. The facts of the present case are distinct from those in *Estelle*. Here, on October 8, 1993, defendant's trial counsel filed a motion for fitness examination, requesting that the trial court "order the Psychiatric Institute of Cook County to conduct an examination of Mr. Haynes and render an opinion on the issue of his fitness for trial." In granting the request of defense counsel, the court ordered the Psychiatric Institute to examine defendant on the issue of his fitness to stand trial and make a report to the court on or before October 29, 1993. The record reveals that a continuance of this due date was granted, and that Dr. Markos reexamined defendant on October 25, 1993, and November 16, 1993. The record also discloses that, upon the request of defense counsel, another order for fitness examination was entered by the court on February 15, 1994, ordering Dr. Markos and Dr. Fauteck to examine defendant for fitness to stand trial and to make a report to the court on or before February 16, 1994. We have previously held that *Estelle* "seemingly excepts defense-initiated examinations from the scope of its rule." *Mahaffey*, 166 Ill. 2d at 28. Because it appears that three of the four examinations of defendant conducted by Dr. Markos were

prompted by defense counsel's request for consideration of defendant's fitness, we find *Estelle* inapposite.

Unless the underlying issues are meritorious, a defendant suffers no prejudice due to appellate counsel's failure to raise those issues on direct appeal. *People v. Coleman*, 168 Ill. 2d 509, 523 (1995). As stated, *Estelle* does not apply to the facts as presented. Therefore, the circuit court appropriately dismissed this claim.

## CONCLUSION

For the reasons stated, the judgment of the circuit court of Cook County dismissing defendant's section 2—1401 petition and defendant's amended post-conviction petition is affirmed. The clerk of this court is directed to enter an order setting Wednesday, November 22, 2000, as the date on which the sentence of death entered in the circuit court of Cook County is to be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 1996). The clerk of this court shall send a certified copy of the mandate to the Director of Corrections, to the warden of Tamms Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*

JUSTICE RATHJE, specially concurring:

I agree with the majority that we should affirm the dismissal of defendant's post-conviction petition. Nevertheless, one problem in the majority's analysis prevents me from joining its opinion.

The majority improperly addresses the merits of defendant's *Brady* claim. This issue is waived because it could have been raised on direct appeal. The majority correctly acknowledges that issues that could have been presented on direct appeal, but were not, are deemed waived for purposes of post-conviction review. See *Towns*, 182 Ill. 2d at 503. That rule is clearly applicable here.

The evidence that defendant claims the State should have turned over prior to his fitness hearing was later introduced by the State at trial. At that point, defendant knew of the evidence, and it was a matter of record. Accordingly, there is no reason that defendant could not have presented this argument on direct appeal.

The majority's reason for relaxing the waiver rule is that defendant attached to the post-conviction petition an affidavit from his attorney stating that the attorney did not have the evidence prior to the fitness hearing. According to the majority, this affidavit "constitutes new information which was not in the original trial record, and, therefore could not have been addressed by a reviewing court on direct appeal." 192 Ill. 2d at 467. The majority's rationale is incorrect.

The proper inquiry is not whether a particular piece of evidence could have been considered on direct appeal, but whether the *claim* could have been considered on direct appeal. In *People v. Whitehead*, 169 Ill. 2d 355, 372 (1996), this court explained this exception to the waiver rule as follows:

"[I]t is not so much that such a claim 'could not have been presented' or 'raised' by a party on direct appeal, but rather that such a claim could not have been *considered* by the reviewing court because the claim's evidentiary basis was *de hors* the record." (Emphasis in original.)

Here, the claim of a *Brady* violation is not outside the record. The evidentiary basis for this claim is the evidence that defendant claims was not turned over prior to the fitness hearing. This evidence was introduced at trial and is part of the original trial record. Accordingly, defendant could have made this argument both at trial and on direct appeal.[1]

The defense attorney's affidavit adds nothing to the

---

[1]Notably, defendant does *not* raise this issue as an ineffective assistance of counsel claim.

*Brady* claim. The affidavit merely states that the defense did not have this information prior to the fitness hearing. In other words, the affidavit is itself the argument that defendant should have made both at trial and on direct appeal. When the State introduced the evidence at trial, defendant should have raised the *Brady* claim. Had that argument proved unsuccessful at trial, defendant should have raised it as an issue on direct appeal.

If the majority is correct that the type of redundant affidavit filed by the defense in this case is sufficient to renew a waived claim, then we have effectively removed any distinction between direct and post-conviction appeals. A post-conviction appeal now is apparently nothing more than a second direct appeal in which defendants can raise all of the arguments that they should have raised, but did not raise, in the first appeal. Even if the claim's evidentiary basis has a clear foundation in the original record, this court will consider the claim if defendant's attorney files an affidavit that does nothing more than state the very argument defendant wishes this court to address. I am not prepared to make such a mockery out of the post-conviction appellate process.

I agree with the majority that defendant is not entitled to an evidentiary hearing on his claim of a *Brady* violation. However, rather than addressing the merits of this argument, I would hold that defendant waived the claim by failing to raise it on direct appeal.

CHIEF JUSTICE HARRISON, dissenting:

Six mental health professionals testified at Haynes' fitness hearing. Psychiatrists Drs. Rafael Carreira and Usha Kartan both diagnosed Haynes with a delusional disorder. Dr. Satinder Brar, a clinical psychologist and coordinator of the residential treatment unit of Cook County jail likewise testified that Haynes suffered from a delusional disorder. Although Dr. Kartan felt unqualified to offer an opinion as to Haynes' ability to cooperate

with defense counsel, Dr. Brar testified that Haynes' condition prevented him from cooperating in his defense. Dr. Paul Fauteck, a forensic psychologist at the Psychiatric Institute, examined Haynes four times during a six-month period. He opined that Haynes was schizophrenic, paranoid type. Dr. Fauteck agreed that Haynes' mental illness rendered him incapable of assisting in his defense and stated that Haynes was not fit to stand trial. Dr. Michael Rabin, another forensic psychologist at the Psychiatric Institute, shared Dr. Fauteck's assessment. He stated that Haynes was paranoid schizophrenic, that he was unable to cooperate with counsel due to his delusional beliefs and that he was unfit for trial. *People v. Haynes*, 174 Ill. 2d 204, 228-31 (1996).

Of all the mental health professionals who testified at trial, the only one to take a contrary view was the State's expert, Dr. Markos. Dr. Markos dismissed Haynes' ideas about "fake Aryan beauty" as being nothing more than "a highly personalized idiosyncratic belief." In Markos' view, Haynes was not schizophrenic and did not suffer from a true psychiatric delusion. The basis for Markos' conclusion was that Haynes' beliefs did not change even after he had been given various antipsychotic drugs. According to Markos,

> "these medications did little at all to change any of his beliefs and that was significant to me because had it been a true delusional process, had it been a true schizophrenic process, then from the clinical standpoint I would have expected *** or seen some remissions with respect to the intensity of his belief or his belief would have disappeared because a true delusion would be amenable to treatment *** ."

In declaring Haynes to be fit to stand trial, the circuit court accepted Markos' assessment and rejected that of all of the other experts whose testimony it considered. We deferred to the circuit court's judgment when the matter was presented to us on direct review. What we

did not know then, what the trial court did not know when it accepted Markos' opinion, and what Markos himself did not realize when he testified at the fitness hearing is that the basis for his opinion was incorrect. Haynes' condition was, in fact, highly amenable to treatment through medication. The problem was simply that the jailhouse doctors had not given him the proper medication in the proper dosage. After Haynes was sentenced to death and remanded to the custody of the Department of Corrections, a staff doctor there altered his medication with dramatic results. The doctor changed Haynes' medication on September 24, 1994, and by November 19, 1994, Haynes' was observed to be "free of delusional behavior." The notions of Aryan supremacy that had led him to kill and then to forgo legal representation at trial had vanished.

Had Markos realized that Haynes would respond so remarkably to a change in medication, his assessment of Haynes condition would unquestionably have been different. Faced with the results obtained by the Department of Corrections medical staff, Markos could not have denied what was so obvious to everyone else. Haynes was not just "idiosyncratic." He was mentally ill.

No claim can be made that Haynes' schizophrenia was somehow fabricated for purposes of his criminal defense. Documentary evidence submitted in support of Haynes' pleadings in this case show that his family has a history of mental illness spanning generations. His great-great grandmother was involuntarily committed in 1894 suffering from "confused" and "irrational" ideas and "delusions of persecution." His great aunt was diagnosed with "dementia praecox, paranoid" in 1939 after she murdered her two young daughters. In 1991, his first cousin, Stacia Bulgar, was diagnosed as "probably paranoid schizophrenic."

Haynes, himself, exhibited pronounced aberrant

behavior long before he started killing people in his bizarre effort to eradicate the nation's supposed non-Aryan ugliness. That behavior was noted by family members, associates, employers and even his one-time landlord, who was a psychiatrist associated with the military. Unknown to Dr. Markos at the time of trial, Haynes was actually diagnosed as schizophrenic for the first time in the early 1980s after engaging in aberrant behavior that led to his arrest by authorities in California.

Mental health professionals who have had the benefit of reviewing Haynes' complete history, including his early medical records and his treatment following his conviction, have confirmed what the doctors knew in 1980: Haynes is a paranoid schizophrenic. Moreover, according to George Woods, M.D., a board-certified psychiatrist whose affidavit was submitted in support of Haynes' petition in the circuit court, Haynes'

> "severe psychotic disorder rendered him paranoid, cognitively unable to prioritize, sequence appropriately, and rationally assist his attorneys in the preparation of his own defense, thereby making him, in my opinion, unfit to stand trial."

Although Haynes' amenability to treatment and the corresponding confirmation of his true condition were not discovered until after trial, those matters bore directly on his status at the time he was tried, convicted and sentenced. They showed that the circuit court's fitness determination was based on a medical error. As noted earlier, there is no question that this error, if discovered earlier, would have altered the outcome of the fitness hearing. Had Markos known of Haynes' complete history and seen the effects that proper medication could have when properly administered, the basis for the doctor's opinion would have been eliminated. He would have had no possible grounds for contradicting all of the other expert testimony and medical evidence, and the

circuit court would have had no basis for declaring Haynes fit.

The purpose of a petition under section 2—1401 is to bring before the court matters of fact which were unknown at the time the judgment was entered, and if known, would have affected or altered the judgment that was entered. See *In re Marriage of Hoppe*, 220 Ill. App. 3d 271, 282 (1991). In my view, this case presents precisely the sort of situation section 2—1401 was intended to address. Haynes' petition has provided the court with an opportunity to correct an obvious and fundamental error. We should welcome that opportunity. At a time when the fairness and reliability of our death penalty law has come under intense scrutiny, this court should redouble its efforts to ensure that capital proceedings are as error free as possible. Regardless of whether one shares my view that the present death penalty law is unconstitutional in all its applications (*People v. Bull*, 185 Ill. 2d 179, 225 (1998) (Harrison, J., concurring in part and dissenting in part)), allowing a death sentence to stand based on a mistake of the magnitude present in this case is intolerable. If my colleagues are serious about rehabilitating the system, this is where they should begin.

Now is not the time for a limited construction of the law. Technical objections have no place. A section 2—1401 petition invokes the equitable powers of the court as justice and fairness require and should be considered in light of equitable principles. Whether a section 2—1401 petition should be granted depends upon the facts and equities presented. Relief is granted under this statute in order to achieve justice, and a liberal construction is used to achieve that end. See *In re Marriage of Hoppe*, 220 Ill. App. 3d at 282-83.

In considering a section 2—1401 petition, the court accepts as true all uncontradicted facts in the petition

and supporting affidavits. See *O'Malley v. Powell*, 202 Ill. App. 3d 529, 533 (1990). Where the facts are challenged by the opposing party, a full and fair evidentiary hearing must be held. See *In re Marriage of Breyley*, 247 Ill. App. 3d 486, 492 (1993). Under these standards, the circuit court should not have dismissed Haynes' section 2—1401 petition on the pleadings. The circuit court's judgment should therefore be reversed, and the cause should be remanded for further proceedings.